# GENERAL COURT, MAY TERM, 1798.

### GRIFFITH vs. GRIFFITH's Executors.

ACTION of *replevin*, removed by *certiorari* from Harford county court.

The *case stated* for the opinion of the court, admitted that *Samuel Griffith*, on the 12th of January 1794, made

and published in writing, his last will and testament, agreeably to law, containing amongst others, the following devise: "*Fourthly.* I desire my wife *Martha Griffith,* should have the use and benefit of my farm on Swan Creek during her widowhood; provided she claims no thirds of my land in Rumney Neck, and that she commits no waste of timber, which will be left to the discretion of my executors and trustees hereafter named; and after which period the aforesaid farm to be sold, and the money equally divided between my eight children," &c.

There was no other devise, or any bequest to his wife. His estate, real and personal, he devised and bequeathed to his children; and the residue of his estate, not particularly devised, he directed to be equally divided between his three daughters.

It was also admitted, that the said *Samuel Griffith* departed this life in the month of March, in the year 1794; and that on the 24th of June 1794, the said will was proved in due form of law, before the register of wills for Harford county, and letters testamentary were thereupon committed to the defendants, who took upon themselves the execution of the office of executors thereof.

It was also admitted, that the plaintiff was the widow of the said *Samuel Griffith,* and did not make any renunciation of the said will; and the property in the writ and declaration in this cause mentioned, was delivered to the plaintiff by the defendants, as executors aforesaid, and was part of the personal property of the said *Samuel Griffith,* which came to their hands as his executors, and was delivered to the plaintiff by the defendants, to be held by the plaintiff as part of her thirds of her husband's personal estate, if by law she was entitled to the same.

And if upon the whole matter the court shall be of opinion, that the plaintiff, as widow of the testator *Samuel Griffith,* and against his will aforesaid, is entitled to one third part of the said testator's personal estate, after payment of debts, then judgment to be entered for the plaintiff for the property in the declaration mentioned, and one shilling current money damages, and costs; but if the court should be of a different opinion, then judgment to be entered for the defendants for a return, &c.

*Winchester* for the plaintiff.—In this case the testator, by his will, devised to his widow, (the plaintiff) a part of his *real estate,* expressing that such devise should be in lieu of her dower in certain other part of his *real estate.* He did not bequeath to her any portion of his personal estate, but bequeathed the whole of it to his children; nor did he express that the devise to his widow was in lieu of her third part of his personal estate;

nor has the widow renounced the will; and the question
for the consideration of the court is, Whether or not the
widow is entitled to one-third part of the personal es-
tate?

Upon an examination of the various acts of assembly
which have been passed upon the subject of the estate of
deceased persons, it appears, by the act of Feb. 1638, ch.
20, that the widow of a deceased intestate was entitled to
one moiety of the personal estate, after payment of
debts, &c. if the deceased left a child or children; but
if he left no child or children, the widow was entitled to
the whole. The act of 1642, ch. 16, contains a similar
provision if there be but one child of the deceased intes-
tate; but if more than one child, then the widow should
be entitled to one-third. By the act of 1671, ch. 27, the
widow of the intestate is allowed one third part of the
personal estate, after debts, &c. are paid, and the rest
to be divided amongst the children of the deceased. The
act of 1681, ch. 2, contains a similar provision; and so
do the acts of 1692, ch. 3, and 1699, ch. 41. In the
last mentioned act of 1699, ch. 41, it is enacted, "That
it shall be at the election of such widow's having devises
*as aforesaid, (a)* to take and receive the same in full sa-
tisfaction of all claims and rights to both real and per-
sonal estate, and to be thereby barred for ever from all
claims to the same; or to refuse such legacies and devi-
ses as aforesaid, and take their third part of the personal
estate, as widows whose husbands die intestate in this
province." The act of 1794, ch. 20, and 1715, ch. 39,
s. 4 & 6, contain precisely the same provisions, where-
by the widow is allowed one-third part of the intestate's
personal estate, after payment of debts, &c. if there be
a child or children; but if there be no child or children,
then she is entitled to one half; and by the acts of 1719,
ch. 14, s. 4, & 1729, ch. 24, s. 19, if there be no children,
nor descendants of such children, nor a brother or sister
of the intestate, nor children of such brother and sister,
then the widow shall be entitled to the whole. By the
acts of 1704, ch. 20, & 1715, ch. 39, s. 35, it is stated,
"And whereas many men have bequeathed and devised,
or hereafter may bequeath or devise, to their wives,
by their last wills, a considerable part of their per-
sonal estates, intending, no doubt, but not expressing
that such bequest or devise should be in full of such
wives part, portion, or third part of the said testator's
estate; and yet such wives, widows and relicts, have not
only claimed such bequest and devise as legacies, but
have further claimed their part of the remaining estate

_____

*(a)* It is not mentioned in the act what devises are meant.

of their deceased husbands;" it was therefore enacted, "that in such case, where the testator bequeaths or devises a considerable part of his personal estate to his wife, and it appears not in any part of his will or codicil that he intended the said devise as a legacy to his wife only, and that she might nevertheless have a third part of his remaining estate, that it shall be at the election of such wife, widow or relict, within forty days after the probate of such will, to make her election before the judge for probate of wills, or the respective deputy commissaries in each respective county, whether she will be content with such devise, or will have her thirds, and release the devise. And if she make choice to have what is so bequeathed or devised to her, then, by that choice, she shall be forever barred from claiming her third part aforesaid; and if she renounce what is so bequeathed and devised, she shall then have her third part aforesaid, and be barred of her devise, but shall not claim or have both; but in case such widow shall neglect to make such election within the time aforesaid, she shall then be concluded by having a full third part of clear personal estate of her deceased husband, besides her dower of his real estate, in full of all such devises or legacies; provided always, that such part of the personal estate be liable to pay the debts of the deceased as other part of the estate is, or ought to be." But by the act of 1729, ch. 24, s. 10, it is enacted, "that if the widow neglect making such election within the forty days, she shall then be concluded by the bequest, and shall not have or claim any more of the personal estate than shall be so bequeathed." By the acts of 1704, ch. 20, and 1715, ch. 39, s. 36, it is also provided, that where any part of the real estate is devised to the widow, she shall make her election within forty days, whether she will accept the devise or her dower; or she shall be concluded by the devise and barred of her dower.

By the act of 1638, ch. 16, "a widow, immediately after the death of her husband, (if she hath no jointure) shall be admitted tenant during her life to one third part of all the land whereof her husband was seised at any time during the coverture, except in cases where she hath acknowledged a fine, or joined with her husband in making of leases; and she shall tarry in the chief house of her husband during her widowhood." And by the act of 1642, ch. 17, "the widow shall succeed to the thirds of the lands, and to the mansion-house, to hold it during her widowhood, as her husband was seised of at any time during the coverture, in such manner as she may by the law of England."

The act of 1641, ch. 3, enacted, "that the lieutenant-general, &c. shall prove wills, and grant administrations, and exercise all temporal jurisdiction to testamentary causes appertaining, and shall do, or cause to be done, right to all persons in all such causes, according to the law of the province, and in defect thereof, according to the law or laudable usage of England, in the same or like cases; and where the same is silent, according to equity and good conscience." By the act of 1642, ch. 4, right and just, in all civil causes, to be determined according to the law, or most general usage of the province since its plantation, or former precedents of the same, or the like nature. In defect of such law, usage or precedent, then according to equity and good conscience; not neglecting (so far as the judges shall be informed thereof, and shall find no inconvenience in the application to this province,) the rules by which right and just useth and ought to be determined in England in the same or the like cases. By the act of 1662, ch. 3. in all cases where the law of this province is silent, justice to be administered according to the laws and statutes of England, if pleaded and produced, and all courts to judge of the right pleading and inconsistency of said laws, with the good of this province, according to the best of their judgment, skill and cunning. The act of 1663, ch. 4, is to the same effect; it was repealed by the act of 1676, ch. 2, but was revived by the act of 1678, ch. 15, and continued until 1684, excepting the clause *so far as the court shall judge them not inconsistent with the condition of the province.* In the acts of 1681, ch. 2, and 1692, ch. 3, it is stated, that "forasmuch as certainty is the mother of repose, and that our dependence upon England obligeth us to make all our laws as near as may be consonant to the laws of England," it was enacted, "that the judge for probate of wills, and granting administration, within this province, in all causes relating to probate of wills, and granting administration, shall proceed according to the laws of England now in force, and hereafter to be in force, within 12 months after such laws shall be published in the kingdom of England, if pleaded before him here; saving in such cases as shall in this act be limited, or shall hereafter be limited, by act of assembly of this province, as utterly impracticable in this province."

Thus the court are put in possession of the several acts of assembly of the province having any bearing upon the subject before the court.

It has always been supposed that the wife was entitled to a third part of her husband's personal estate against his will, and reason and justice are in favour of her

MAY 1798.

Griffith
vs
Griffith's executors.

claim. The general law of England, and the custom of particular places, allowed the wife a third of the personal estate, if the deceased left children. In the acts of 1704 and 1715, is recognised the common usage of allowing to the widow a third part of her husband's personal estate.

In treating of this subject, *Blackstone* says, " that by the common law, as it stood in the reign of *Henry II.* a man's goods were to be divided into three equal parts; of which one went to his heirs or lineal descendants, another to his wife, and the third was at his own disposal; or, if he died without a wife, he might then dispose of one moiety, and the other went to his children; and so *e converso*, if he had no children the wife was entitled to one moiety, and he might bequeath the other; but if he died without either wife or issue, the whole was at his own disposal. The shares of the wife and children were called their *reasonable* parts; and the writ de rationabili parte bonorum was given to recover them. This continued to be the law of the land at the time of *Magna Charta*, (9 Hen. III. A. D. 1225,) ch. 18, which secured to the wife her reasonable part, after the king's debts were paid. In the reign of *Edward III.* this right of the wife and children was still held to be the universal or common law, though frequently pleaded as the local custom of particular countries; and Sir *Henry Finch* lays it down expressly in the reign of *Charles I.* to be the general law of the land. But this law is at present altered by imperceptible degrees, and the deceased may now by will bequeath the whole of his goods and chattels; though we cannot trace out when first this alteration began. Indeed, Sir *Edward Coke* (2 *Inst.* 33,) is of opinion, that this never was the general law, but only obtained in particular places by special custom; and to establish that doctrine he relies on a passage in *Bracton*, which in truth, when compared with the context, makes directly against his opinion. For *Bracton* lays down the doctrine of the reasonable part to be the common law, but mentions that as a particular exception, which *Coke* has hastily cited for the general rule. And *Glanvil, Magna Charta, Fleta, The Year Books, Fitzherbert* and *Finch*, all agree with *Bracton*, that this right to the *pars rationabilis* was by the common law, which continues to be the general law of Scotland. To which may be added, that whatever may have been the custom of later years in many parts of England, or however it was introduced in derogation of the old common law, the ancient method continued in use in York, Wales, and in London, till very modern times; when in order to favour the power of bequeathing, and to reduce the whole kingdom to the same standard, three statutes have been pro-

MAY 1798.

Griffith
vs.
Griffith's executors.

vided, 4 and 5 W. & M. ch. 2, explained by 2 & 3 Ann. ch. 5, for York; 7 & 8 W. III. ch. 38, for Wales; and 11 Geo. 1. ch. 18, for London; whereby it is enacted, that persons within those districts, and liable to those customs, may (if they think proper) dispose of *all* their personal estates by will; and the claims of the widow, children, and other relations, to the contrary, are totally barred. Thus is the old common law now utterly abolished throughout all the kingdom of England, and a man may devise the whole of his chattels as freely as he formerly could his third part or moiety."—2. *Black. Com.* 493.

The right of the wife to a third part of the personal estate of her deceased husband, is a common law right, and the action of *rationabili parte bonorum* lies for her against the executors of her husband—18 *Viner*, 158.

In different parts of England particular customs prevailed, which controuled the general law of intestacy. Of all these customs, that which gave a third to the wife, another to the children, and a third to the deceased, and in case of only a wife, or only children, the half, was most frequently met with. Indeed this claim of the wife and children, where it prevailed, had been carried still further. It had been construed to be such an inherent right in them, as to restrain the power of disappointing them of this *reasonable part of the goods* by will; the possessor, it was contended, having a power of disposing by will of nothing but his portion, or *dead man's part*. The question had all along been, whether this was a common law right, or one supported only by the special custom of different places; and the last determination, in the 40th year of the reign of *Edward III.* seems to countenance the latter opinion. Conformably with those decisions, we find an action in the 28th year of the reign of *Henry VI.* and another in the 7th *Edward IV.* against an executor for a reasonable part, where a special custom of a county is alleged. There is an instance of one action, which was grounded upon the usage generally, without stating it to be of the realm, of any county or place—30th *Henry VI.* If we look a little further on in the judicial history of England, we find it laid down positively, by *Fitzherbert* and others, in the reign of Henry VIII, that this claim of the wife and children was by the common law that prevailed through the whole realm; and that the action *de rationabili parte* might be maintained against the executors; so that the power of making a will was, in case of leaving a wife or children, confined to the dead man's part. This opinion seems to be strenuously maintained by *Brooke,* some time after the reign of *Henry VIII.*

MAY 1798.

Griffith
vs.
Griffith's executors.

4 *Reeves Hist. Eng. Law*, 82, 83.    *Brooke Rationabili pars.* 7.

The right of the wife to a third part of her husband's personal estate, under a general or particular custom, was never disputed. That right was extended to *Maryland* as the common law, and has been invariably adhered to as such. If such right was not the common law at the time of the colonization of the province, the acts of 1704 and 1715 recognize the usage, and they are to be considered as a recognition and restoration of the common law.

In the case of *Worthington and wife, and Hood, vs. Hood's executor,* in the court of chancery April 1795, Chancellor *Hanson,* in giving his opinion on one of the points "which did not to him appear involved in any doubt or difficulty, declares, that in his opinion *Elizabeth Hood,* the relict of *John Hood,* was entitled to one third part of his personal estate, supposing the matters stated in the bill and answer to be true; that is to say, if a testator devises or bequeaths nothing to his wife, there is no necessity for her to renounce his will, in order that she may be entitled to one third part of his personal estate absolutely, and of his real estate during her life. In such a case the widow has nothing to renounce; her husband having as to her, died intestate."

The devise of the part of the real estate to the plaintiff cannot conclude her as to the personal estate. The act of assembly has an express relation, as well to the real as to the personal estate, and requires a disposition of part of *each* to her to divest her right to *both.* The widow in this case not having renounced the will, is concluded as to the *real estate* devised to her; but there being no devise to her of any part of the personal estate in her husband's will, there was no necessity for making an *election* as to the personal estate, nothing being given; and therefore she is entitled to one third part of the personal estate clear of debts. This right is fully recognized in the acts of assembly of 1715 and 1729, and is only to be defeated where the husband devises to his wife a part of the personal estate, and she does not make her election within the time prescribed by law.

*Martin,* (Attorney General,) for the defendants, contended, that the wife gains no part of her husband's property during his life; but upon his death *intestate,* she is entitled to one third part of his personal property which remains after payment of debts, if he left issue; but if he left no issue, she is entitled to one half. But the husband, if he thinks proper, may devise such estate from her. This right of the wife is founded upon the statute of distributions. By the death of the hus-

band the wife becomes entitled, during her life, to one third part of the real estate of which the husband was seised during the coverture. This estate is termed dower; of this the husband cannot deprive her by will; nor can he by any conveyance, unless her consent is given by joining with him in the conveyance, and acknowledging it on a private examination. But it is different with respect to personal property; for he can dispose of that in his life-time without the consent of the wife; and if so, there is no reason why he cannot do that by will which he might do in his life-time by gift or sale without her consent, and prevent her from receiving any portion of it.

The right of the wife to the third part of the personal property of her husband must depend on the common law, or on the acts of assembly. The acts of assembly, it is admitted, do not apply to the case. The common law of England is the common law of Maryland. It has no other common law, and is not entitled to any of the local customs of England. The common law is founded on statutes, is known by the writers on the law, and by the decisions of the courts of justice. Customs to prevail, must be from time immemorial, and then they become laws. The common law of England was adopted in Maryland as it stood at the formation of our government, and it never did deprive the husband of the right to dispose of his personal estate.

The writ *de rationabili parte bonorum* lies by the wife against the executors of her husband, where she cannot have the third part of her husband's goods after the debts are paid, and funeral expenses performed; and *Fitzherbert* 284, observing on this writ, says, that it seems by *Magna Charta* ch. 18, that this was by the common law; yet (he observes) the writs in the register rehearse the customs of the counties, and cites authorities, to shew the writ was founded on the customs of particular counties.

Heirs, says *Glanville*, were bound to observe the testaments of their fathers, and to pay all their debts. For every freeman, not incumbered with debts beyond the amount of his effects, might make a reasonable division of his property, by will, so as he complied with the customs of the place where he lived; one of which was, first, to remember his lord by the best and principal chattel; then the church; and after these, he might dispose of the remainder as he pleased. However the customs of particular places might lay this restriction upon wills, no person was bound, by the general law of the kingdom, to leave any thing by will to any particular person, but was at liberty to act as he pleased; it being a rule of

law, that *ultima voluntas esset libera.* But *Glanville* thought it would be a proper testimony of affection and tenderness for a husband to give to his wife *rationabilem divisam,* that is a third part of his effects, this being what she would be entitled to, if she had survived him; and it seems that it was not unfrequent to give a sort of property to their wives in this third part, even during the coverture. But *Glanville,* after having expressly laid down, that, by the general law of the kingdom, no person was bound to leave any thing by will to any particular person, and that the third part left to the wife was dictated rather by a moral than legal obligation, he goes on in the following remarkable words: "When a person is about to make his will, if he has more than enough to pay his debts, then all his moveables shall be divided into three equal parts; of which one shall go to the heir, another to the wife, the third be reserved to himself, over which he has the power of disposal as he pleases; if he dies without leaving a wife, a half is to be reserved to the testator."—1 *Reeves Hist. Eng. Law,* 111, 112. By *Magna Charta,* ch. 18, after the king's debts are satisfied, the residue is to remain to the executors, to perform the will of the deceased; if nothing is due to the king, then all the chattels are to go to use of the defunct, (that is, to his executors or administrators,) saving, says the statute, to the wife and children their reasonable parts; the latter part of which provision does not seem to remove any of the difficulties which were before noticed in the text of *Glanville*—1 *Reeves* 243, 244. 2 *Inst.* 32, 33.

In the first year of the reign of *Edward II.* a writ *de rationabili parte* was brought by a son against his father's executors, for ten marks of the property of the deceased, who died worth thirty; alleging, that, because *par usage de pais,* the third part ought to go to the deceased, a third to his widow, and a third to the children unmarried, therefore he, as son, demanded his third. To this it was pleaded, that he had been advanced by a lease of lands from his father of such value, and therefore the action would not lie. The plaintiff admitted this in his replication, but said the land was worth only so much, and therefore he ought to maintain his action. However, it was decided against him, as the action was grounded wholly upon usage and want of advancement. So that this writ, notwithstanding what was argued, as to the declaration of *Magna Charta,* which was contended to be general and absolute, was held by the court to be founded on the *particular* custom of a certain place. Again, we find in the 17th year of *Edward II.* a writ of detinue of chattels was brought by an infant against his father's

'executors, reciting, that *per consuetudinem regni*, the mother was to have a third, the children a third, and the executors another third, &c. To this the defendant pleaded *pleinment administre.* One of the justices took up the matter, and expressed a doubt whether the action would lie; for says he, the writ is founded on a custom, but we know no such custom, and the law is otherwise. And when it was urged that the custom was good, as appeared by *Magna Charta* in these words, *salvis uxoris et pueris suis rationabilibus partibus suis,* he replied, that the Great Charter only saved to the children their *own* goods, which might happen to come into the hands of the father; but neither the Great Charter nor the common law restrained the father's power over his own effects, to give or devise them as he pleased. It was added by another, that he had often seen such writs, but never knew one of them maintained; so the plaintiff was nonsuit. This was the opinion in the reign of *Edward II.* respecting the power of bequeathing, where a wife and children were left by the testator. These two cases may be construed as a clear confirmation of the law as laid down by *Glanville.* The latter, which applies to the general law of the kingdom, certainly supports that author's declaration, *quod ultima voluntas esset libera.* The former may be thought to explain the other passage in *Glanville,* which qualifies, if not contradicts that general rule; and may, perhaps, serve to shew, that *Glanville* should there be understood to speak of certain local customs; which interpretation, however, does not seem warranted by the present state of that author's text.—2 *Reeves* 334, 335. These actions, notwithstanding the above decisions, continued to be brought, and were variously treated by the courts. The point upon which this question rested, seems to have no other authority in the law books than a chapter in *Magna Charta,* and a passage in *Glanville.* The chapter of the Great Charter is not directly upon the subject of distributing the effects of deceased persons; but having ordained a surer method of levying the king's debt, it adds, as a security to the subject, that all the rest shall belong to the dead person, *saving* their reasonable parts to the wife and children; a saving which seems sufficiently necessary, if it were only on account of the particular customs in some counties, and other places, which required a man always to leave something to his wife and children, and which would otherwise have been abrogated by the general scope of the former provision. It does not, therefore, seem a necessary conclusion from thence, that such a distribution of the effects was the general law of the kingdom. As to the

passage in *Glanville*, there seems in it an ambiguity, if not a contradiction. That author might be quoted as well in favour of as against the proposition, *that it was the general law of the kingdom for a man's wife and children to be entitled to a proportion of his effects, notwithstanding a will.* Upon these authorities, together with the determinations mentioned in the reign of *Edward II.* stood this question, when it underwent the following discussion: In the third year of *Edward III.* an action of detinue, brought by a husband and wife against the executors of the wife's father, for her child's portion; it was laid upon *the custom of the county of Northampton*, and she alleged she was not advanced by her father. The cause went off upon the issue, whether married and advanced by her father, without any question arising about the point of law. In 17 *Edward III.* such a writ of detinue was brought by a baron and feme, for her *reasonable part* of her former husband's goods, against his executors; which writ made mention of the custom of the realm; but went off upon another point. In the 30th of *Edward III.* there was another writ of detinue. It was objected to this writ, that it made mention of common usage through the whole realm, which could mean nothing but the common law; and if it was the common law, he might have a simple writ of detinue. That such a writ had been abated; meaning no doubt that mentioned in the 17th Edward III. It was argued, that in that case the writ was abated, because it purported to be founded on the Great Charter. In like manner, should a woman bring a writ of dower, and demand a moiety, if the custom was comprised in the writ, it would be bad; and therefore she should make her demand in the writ generally, and upon that should shew special matter to maintain her demand: So it might be here, and the plaintiff might count according to the case. One of the clerks having shewed a writ brought by an infant not advanced, containing all the matter of this writ, which he said, was held maintainable, the debate upon the form of the writ rested. And when the executors began to resort to other points, namely, that they were to account before the ordinary, and that this question of distribution belonged rather to the spiritual than the temporal court, they were told they were not to plead to the jurisdiction, after they had objected to the writ; so that, upon the whole, it should seem as if the writ was there approved of. The next action that appears in the books, was grounded upon the custom of the county of *Sussex*, which was stated as allowing a reasonable part of the *intestate* father's goods to go to the son; but this being upon an intestacy, led to no debate upon the before mentioned point; though

it was said, this custom precluded the father from making a will in prejudice of his wife and children. On that occasion, it was said, that this writ, in case of intestacy, had always been admitted by the ordinary. The next is in the 40*th Edward III.* This is grounded upon the custom of a vill, by which the children were to have a reasonable part of their father's goods; but it does not appear whether it was brought against executors, or upon an intestacy. However the defendant set up an advancement as a plea in bar; to which the plaintiffs replied, the gift mentioned was only a reversion, and therefore no lawful advancement to bar their reasonable portion. The defendant said it was, and demanded judgment, which drew from the bench the following observations: *Thorpe,* one of the justices said, *How can we give judgment, when you have accepted an action which is contrary to the law,* and have pleaded matter in affirmance of it? And *Mowbray,* another justice, said, *The lords in parliament would never grant that this action should be maintainable by any common custom, or law of this realm.* But as the plaintiff had not pleaded to the writ, the justices took time to advise what should be done. The writ in question being grounded on a *particular* custom, and it not appearing whether it was brought in the case of a will, or of an intestacy, we are left quite at a loss for the grounds on which the judges pronounced the above mentioned opinion; for though there might be arguments against such a *general* custom, or against alleging it in the writ, it is difficult to say that such a particular custom might not be good; though *Thorpe* doubted of it in the former case from Sussex, saying, it was hard to restrain a man from making a will of his own effects. Thus the law stood at the latter end of the reign of *Edward III.* as it did at the close of the former; and conformably with this opinion against the writ, it is not inserted in the old *Natura Brevium,* which has only the writ of right *de rationabili parte.* It is remarkable that this writ of right is omitted in *Fitzherbert,* and the writ of detinue now in question adopted, under the denomination of *de rationabili parte bonorum.* It seems strange, that a question of so extensive importance, and so frequent recurrence, as the disposition of a deceased person's effects, whether by will or administration, should remain a doubtful case at this time. Perhaps the jurisdiction which the spiritual court had exercised over testamentary matters, tended to keep this point of law in obscurity, and undecided. After all, it is difficult at this time to account for so singular a difference in opinion—3 *Reeves,* 67 *to* 72. In 4 *Reeves,* 82, 83, the question was, whether the right of the wife is founded on the common law or on particular cus-

VOL. IV. 15

toms. In *Swinb.* 203, 206, the writ *de rationabili parte bonorum,* is stated not to lie at common law.

The opinion prevailed, that at common law the wife was not entitled to a third part of the husband's personal estate against his will; and it was resolved in parliament, that by the common law the wife was not entitled to a third part of the husband's personal estate—*Co. Litt.* 176, 177.—2 *Blk. Com.* 494, *(note.)* In *Hutton's Reports,* 109, 110, (6 *Car. I.*) the action was founded on a particular custom. It is an absurd notion that the common law and local customs should be the same.

As to the case in *Viner's Abridgment,* he only abridges the case, and it is no authority as to what the law is.

By the declaration of rights, the inhabitants of Maryland are entitled to the common law of England, as it existed at the time of the formation of the government, and to the benefit of such of the English statutes as existed at the time of their first emigration, and which by experience have been found applicable to their local and other circumstances, and of such others as have been since made in England or Great Britain, and have been introduced, used and practised, by the courts of law or equity; and also to all acts of assembly in force on the 1st of June 1774, except such as may have since expired, or have been, or may be altered, &c. It was the common law, and not particular customs, which were adopted as the rule of decision for our courts. The act of 1704 is the first act we have here upon the subject. There was no usage or practice antecedent to that time, entitling the wife to a third part of the personal estate of her husband. The act of 1641, ch. 4, was respecting the rules of judicature, and was made only four years after the first session held in the province, and nine after the charter, which was granted to Lord *Baltimore* on the 20th of June 1632.

If it is by usage that the wife is entitled to the third part of the personal estate of her husband, there must be some proof of such a usage. There has been no legal decision in the courts here on this question, nor is there any usage to support the opinion.

A legatee shall not take both the legacy and the surplus. A man may make a will, and die intestate as to part of his estate, and in such cases, where there had been a legacy to the wife, she took the legacy and a third part of the personal estate undisposed of, and the act of assembly was intended to prevent the wife from claiming both. The act of 1715, ch. 39, gives an option to the wife, but it did not interfere with any bequest in the will; and the *remaining estate* means what was undisposed of by her husband's will. The expres-

May 1798.

Griffith
vs.
Griffith's ex-
ecutors.

sion cannot refer to property devised away. This ex-
position of the act of assembly prevents any interfer-
ence between the wife and the legatees; a contrary one
would introduce confusion, and create suits in chancery.
The utmost that can be inferred from the act of assem-
bly is, that the legislature apprehended the wife would
be entitled to a third of the personal estate of her hus-
band; but they were mistaken in the law, which is no
uncommon case.

As to the case in the court of chancery, referred to,
of *Worthington and others vs. Hood,* it is at most only
the opinion of the chancellor, not acted upon in the su-
perior court. As to the idea that the husband died in-
testate as to the widow, where he had bequeathed the
whole of his estate from her, he contended that no per-
son who has disposed of all his estate by will can die
intestate as to a particular person. It is a general
principle, that a person who takes by the will shall not
reject it as it respects other property. "It is a tacit
condition that every man who takes under a will is
bound, not only not to dispute the will, but to maintain
the title of all the rest, unless he give up every thing
under it. No rule can be better established, than that
whoever takes under a will, unless he give up the right
which he derives from it, cannot dispute other provi-
sions of it. A most reasonable rule; because a man
makes his will, supposing the whole to stand."—Per
Lord *Mansfield,* 4 *T. R.* 743, *(note.)*

The acts of 1715, ch. 39, s. 35, and 1729, ch. 24, s.
10, are the same, except as to the wife's election. These
acts were grounded on the English statutes of distribu-
tions.

*Winchester,* in reply. The common law is that body
of rules generally received and held as law in England,
in contradistinction to the statute or written law, and
including not only general customs, or the common law
properly so called, but also the particular customs of
certain parts of the kingdom, and likewise those parti-
cular laws which are by custom observed only in certain
courts and jurisdictions. The common law is grounded
upon the general customs of the realm, and compre-
hends the law of nature, the law of God, and the prin-
ciples and maxims of the law. It is founded upon rea-
son, acquired by long study, observation and experience,
and refined by learned men in all ages. It is justly re-
garded as the common birth right, which the subject
has for the safe guard and defence, not only of his
goods, lands and revenues, but of his wife and children,
body, fame, and even life—*Co. Litt.* 97. 142. The com-
mon law of England is properly the common customs

of the kingdom, which by length of time have obtained the force of laws. The goodness of a custom depends upon its having been used time out of mind, or, in the solemnity of our legal phrase, time whereof the memory of man runneth not to the contrary. This gives it its weight and authority; and of this nature are the maxims and customs which compose the common law, or *lex non scripta* of the kingdom. It is properly distinguished into three kinds—1. General customs, which are the universal rule of the whole kingdom, and form the common law in its stricter and more usual signification. 2. Particular customs, which for the most part affect only the inhabitants of particular districts. 3. Certain particular laws, which by custom are adopted and used, by some particular courts, of pretty general and extensive jurisdiction. It is called the *unwritten law*, not because it is only transmitted by tradition from generation to generation, but because it is not founded on any known act of the legislature. It receives its force from immemorial custom, and for the most part, derives its origin from acts of parliament enacted in the times which immediately followed the conquest, (particularly those anterior to the time of *Richard* the first) the originals of which are lost. The source from which the decisions of the common law are drawn, is what is called *præteritorum memoria eventorum*, and is founded in the collection of judgments which have been passed from time immemorial, and which, as well as the proceedings relative to them, are carefully preserved under the title of *records*. In order that the principles established by such a series of judgments may be known, *reports* from them have been published from time to time, which reach as far back as the reign of *Edward* the II. Besides these reports, there are also some ancient authors, of great authority among lawyers, such as the famous and learned *Glanville*, Lord Chief Justice, who wrote under the reign of *Henry II; Bracton*, a great lawyer, said to be Lord Chief Justice, who wrote under *Henry III;* the author of *Fleta*, and the renowned lawyer *Littleton*, who wrote in the time of *Edward IV.* Among more modern authors, is the great oracle of the law Sir *Edward Coke*, Lord Chief Justice under *James I.* who has written four books, his learned and laborious *institutes* of the law, and commentary on *Littleton*. The common law moreover comprehends some particular customs, which are fragments of the ancient *Saxon* laws escaped from the disaster of the conquest.

The common law was adopted, received, and recognized in Maryland, as it stood in England at the time of

the charter to Lord *Baltimore*; and the principle contend-
ed for is recognized in the act of assembly.

Suppose there had been a decision restraining the tes-
tamentary disposition, and the act of assembly had been
grounded on it, would it not have been a clear recogni-
tion of such a decision? The acts of assembly are the
best evidence as to the customs and usages which prevail-
ed antecedent to that time. Common usages shall pre-
vail; and a practice recognized by acts of assembly must
be considered as the common law founded on previous
decisions of the court.

In answer to the case in 4 *T. R.* 743, he refers the court
to the case of *Andrews' ext'rs. vs. Hay*, decided in this
court at October term 1790. The case was, the plain-
tiff's testator devised to his daughter, the defendant's
wife, a house and lot. He also bequeathed to another
daughter a negro slave called *Hector*. The defendant en-
tered into the house and lot under the devise, and enjoy-
ed the same. He also claimed the slave called *Hector*,
under a parol gift to his wife, by the testator, before
the marriage, and before the making of the will. The
question before the court was, whether the defendant,
having entered into and held the house and lot devised to
his wife, could be admitted to controvert the will as to
the validity of the bequest of *Hector*; and whether he was
not *estopped* from denying that *Hector* was a part of the
personal estate of the testator at the time of making the
will? The general court gave judgment for the defend-
ant.

Suppose under the act of 1729, there had been some
trifling bequest in the will to the wife; for instance one
shilling, and she does not renounce the will; she would
be entitled to a third part of the remaining personal es-
tate; for the act says the wife is only to be barred where
*a considerable part* of the personal estate has been be-
queathed to her, and it does not appear that it was in-
tended as a legacy only.

THE OPINION of *William Pinkney*, Esquire, *(a)* on the
will of *Samuel Griffith*.

MR. GRIFFITH's will bequeaths no part of his perso-
nal estate to Mrs. *Griffith*, but on the contrary bequeaths
it all away from her, and she did not renounce the
will.

It is required, whether under these circumstances she
is entitled to *a third part of the personal estate clear of
debts*. I am of opinion that she is so entitled; and as

*(a)* Mr. Pinkney was absent on a mission to Great Britain when
this case was argued.

the point is an important one, I will state my reasons at large.

It has for many years past (and I believe from the first settlement of the province but certainly ever since the act of 1715 ch. 39) been the prevailing idea in this country among lawyers, as well as others, that a husband could not devise away the whole of his personal estate from his wife. This idea has been almost (if not perfectly) universal, and it is supposed to have originated entirely from the provisions of the act of 1715. I think it did not take its rise solely from that act. But let its origin have been what it might, it has been received as settled and established law, and has in part been recognized by our testamentary tribunals. Whether it is a just idea, or otherwise, will not be discovered by a mere examination of the act of 1715; for, although in the passage of that act the general assembly evidently considered it as a rule of law, that the wife could not be debarred of her thirds by the last will of her husband, yet as there is nothing in the act which actually provides to the full extent of the rule, or establishes it in so many words beyond certain specified instances, the rule, as it has been since understood, could not probably have been derived from that act alone. It appears to me, that it was part of the law of Maryland *before that act was in existence;* for if it was not, it is inconceivable, that the fact of the general assembly having mistaken the law should have totally changed it without any legislative provision sufficiently extensive to do so. The provisions of the act of 1715 apply only to a single case, *i. e.* where the husband bequeathed a considerable part of his personal estate to the wife, and she renounces *(a)* within forty days. In this case she is declared to be entitled to one *full* third of the *clear* personal estate; which expressions unquestionably mean a full third, clear of debts. *(b)* But this act goes no farther. It does not enact the general rule before mentioned although it certainly acts upon it as applying to the instance for which it was making provision. The reason why it did not enact to the full extent of the general rule was evidently this, that the assembly considered that rule as being already the law of the land. Their object was rather *to limit its operation,* than to *establish it.* Their view was *to* prevent a consequence from it which they considered as unjust, and not to introduce it. They believed

*(a)* If the widow neglects to elect within 40 days, she shall be concluded *by the bequest,* and shall not claim more of the personal estate than shall be so bequeathed, &c. *Vide* the act of 1729, ch. 24.

*(b)* *Vide* the whole clause (*35th section* of the act of 1715, ch. 39,) and the proviso about debts.

May 1798.

Griffith
vs
Griffith's ex-
ecutors.

it to have been introduced before, and to have been the undoubted law of Maryland, (VIDE *the preamble of the clause.*) In this belief I think they were not mistaken; but whether they were mistaken or not, it is extremely clear to me, that their opinion concurred with the received and settled doctrine and practice at that time. How that doctrine came to be received will appear from the history of some part of the English law, which I will state from the *2d vol. of Blackstone's Commentaries, pages* 494, 495, 496, 497. "By the common law of England, as it stood in the reign of *Henry II.* a man's personal estate was to be divided in three equal parts; of which one went to his heirs or lineal descendants, another to his wife, and the third was at his own disposal," &c. "The shares of the wife and children were called their *reasonable parts,*" which the husband could not devise away from them, and a writ was given to recover them. "This continued to be the law of the land at the time of *Magna Charta.* In the reign of *Edward III.* this right of the wife and children was held to be the universal or common law; and *Sir Henry Finch* lays it down expressly *in the reign of Charles the first,* to be the general law of the land. But this law is at present (in England) altered by imperceptible degrees, (not by statute) and the deceased may now by will bequeath the whole of his goods and chattels; though we cannot trace out when first the alteration began." The same author remarks, that the old rule continues to be the law of Scotland to this day; and that it also continued in Wales, the province of York, and the city of London, till very modern times, when it was altered by different statutes, passed in the reigns of *William and Mary,* Queen *Ann,* and *George I.*

It will appear from the above statement, that in the reign of *Charles the first,* the widow was entitled to one third of her husband's personal estate, by the common law, and that he could not devise it away from her. The charter of Maryland bears date in the eighth year of that king's reign; and colonization commenced about the same period. It follows, that the emigrants to this country brought the then established law along with them, and received and acted upon it here as a rule of property. From colonization to the act of 1715, the rule remained unchanged in this country, although in England it was undergoing gradual alterations—and in 1715, the provincial legislature expressly recognize it as settled law, and proceed to limit its effects in the case already mentioned. It is true indeed, that the colonists did not adopt the whole of the rule, for they do not seem to have acknowledged the *right of the children;* but that

they adopted and practised the rule so far as respected the wife, is extremely obvious. The change of the law in England could have no influence upon it here—It was not changed by an act of parliament, or suddenly changed; it altered imperceptibly and silently. The colonists being far removed from the mother country, either did not know of this change, or did not choose to follow it; and it is clear that they were not bound to follow it; on the contrary the colonial assembly recognize the rule, and legislate upon it; for it is impossible to think that the act of 1715 is not founded upon the admission of this rule, merely calculated to restrict its influence upon a particular case. Upon the whole, it occurs to me, that this right of the wife to a third part of the husband's personal estate, in opposition to his last will and testament, was the law of England at the time of our colonization; that colonists brought this law with them, received it, and acted upon it until 1715, when (although it needed no ratification) it was confirmed by the opinion and provisions of the legislature. The passage cited from *Blackstone's Commentaries*, coupled with the act of 1715, is satisfactory to my mind.

Upon what ground did the general assembly proceed if not upon that which I have stated? It cannot be supposed that they so totally mistook as to take that for law in a point of this kind which was not so received in general. They must have had some reason for thinking that the law was as they have plainly supposed; and this reason could be no other than the then established usage and settled opinion in the province. That usage, and that opinion, could have had no other probable origin than the one before alluded to; and this origin was a legal one. It would have been a legal one even if the law of England had been changed without an act of parliament before the reign of *Charles the first;* for I know of no authority courts of judicature have to alter the common law. I hold, therefore, that the law of Maryland is, that a husband cannot devise away his personal estate from his wife so as to debar her of her thirds. In a case circumstanced like the present, there was no necessity for renunciation. No personal estate was bequeathed to *Mrs. Griffith*, and of course there was nothing to renounce. The acts of 1715 and 1729 relate to cases only where a considerable part of the personal estate was given to the wife. There was a plain reason for demanding a renunciation there, which has no existence here. The object of the law was to preclude the wife from taking both *under the will*, and *under the rule before* mentioned; and

clearly that object does not embrace an instance where nothing is given, or can be taken under the will, but solely under the general rule.

I have thus far considered this case upon the footing of what I allege to have been the law of this country before the act of 1715; but even under that act alone, and the practice since, I should be inclined to hold the same opinion. I do not think indeed that the act of 1715 reaches, in the letter of its provisions, the present case; but as it sanctions the wife's right in one instance, in opposition to the husband's bequest to other people, and as the same reason applies to the case in question, I should suppose it would be going too far at this time of day, by a strict and rigid construction, to shake the liberal interpretation that is supposed to have been given to it by the general consent and uninterrupted usages.

In one point of view this act of assembly (even admitting that it introduced the law into Maryland which I deny) will come strongly to this case. The wife's right to her thirds, in opposition to her husband's testament, was the common law of England, and if altered without authority by judges before colonization, and not introduced into Maryland before the act of 1715, that act may be considered as declaratory of the common law, and thus as justifying or rather requiring its revival. The common law had never been altered by those who were empowered to alter it; and a discontinuance of the use of it for a time had not abolished it. This act admits its force, and brings it forward into practice as a rule of property. That rule has ever since been held as law and it cannot now be shaken. It stands on the firm foundation of the ancient common law, not repealed or abrogated. It is *acknowledged*, if not re-enacted, by two acts of our general assembly. It is strengthened by the uniform opinion and usage of the country; and if it is not now the law of this state, it will be difficult to shew that we have any law at all.

WM. PINKNEY.

THE OPINION of *William Cooke*, Esquire.

I am of opinion a husband cannot by devise of any, or all of his personal estate, prevent his wife of dower, or rather of claiming one third part thereof, if he leaves children; or of one half if he leaves none. I am also of opinion that the will of *Samuel Griffith* bars his wife of dower only in that part of his real estate in Rumney Neck, the use of the farm on Swan creek being given in lieu thereof; and that she is entitled to dower in his other real estate, and of one third of his personal estate after payment of debts.
W. COOKE.

Chase J.—I consider the acts of assembly of 1704, 1715, & 1729, as a clear and explicit recognition of the right of the wife to one third part of the personal estate; and I consider these successive acts of the legislature, and the uniform practice conformable thereto, as the best evidence of what was the common law in the opinion and judgment of the legislature and the citizens of Maryland.

Suppose it questionable, and not well settled in England, the acts of the legislature, and the practice here, prove, beyond a doubt, that it was the general opinion the wife was entitled to a third part of the personal estate by the common law.

*Magna Charta ch.* 18, saves to the wife her reasonable part. *Bracton,* who wrote soon after this statute, lays it down as the common law, that after the payment of debts and funeral expenses, the wife was to have one third, &c.

There is no reason why the saving in *Magna Charta* should be limited to the customary right of the wife. Such an exposition is confined and illiberal, and not warranted by the statute. The saving is general, and must relate to the common law right of the wife. There are no restrictive words in the statute to confine the operation of the saving to the right by custom.

At common law the wife was entitled to a third part of the personal estate, independent of the husband; and a bequest made to her by the husband, was not considered in lieu and exclusive of her dower; but she would take both.

The custom was in derogation of the common law, and abridged the right of the wife.

According to the custom of the city of London, if the husband devised a part of his personal estate to his wife, she was concluded by the bequest, and deprived of her customary right, unless it appeared by his will he intended she should have both.

Our acts of assembly are grounded on the custom of London. The acts of 1704 and 1715, give the wife an election. The act of 1729 concludes her by the bequest, unless she renounces the will.

According to our acts of assembly the wife could take the bequest and the third part also, if such appeared to be the intention of the husband.

The acts of 1704, ch. 14, and 1715, ch. 40, passed in the same years, relating to attachments, are allowed to be founded on the custom of London; and these acts, concerning the dower of the wife, from their analogy to the custom of London, in that respect, I presume were grounded on that custom.

It is the opinion of Judge *Blackstone* that the wife at common law was entitled to a third part of the personal

estate; and this opinion is supported by great and respectable authorities, *Bracton* and many others; and Blackstone cites a decision of *Finch*, in the time of *Charles I.* (which was about the time our charter was granted) in support of this opinion. The advocates for the contrary doctrine adopt the opinion of Lord *Coke*, which I have presumed to controvert on the authority of *Bracton* and Judge *Blackstone*, and for the reasons I have assigned. Upon the whole, I am of opinion that the plaintiff in this case is entitled to one third part of the personal estate of her husband, after deducting the debts and funeral charges.

MAY 1798.

Griffith
vs.
Griffith's executors.

GOLDSBOROUGH, Ch. J. and DUVALL, J. concurred in this opinion.

JUDGMENT upon the case stated for the plaintiff. The defendants appealed to the court of appeals; and the judgment of the general court was *affirmed* in the Court of Appeals at November term, 1801.

MARTIN, (Attorney-General,) and HOLLINGSWORTH, for the appellants.

A. HALL, KEY, and WINCHESTER, for the appellee.

---

## GENERAL COURT, MAY TERM, 1798.