959 A.2d 1147

**Maryse L. KARSENTY, et al.**

v.

**Kathleen Sexton SCHOUKROUN.**

**No. 2, Sept. Term, 2008.**

Court of Appeals of Maryland.

Nov. 12, 2008.

470

472

474

Linda K. Brown of Laurel, Karen D. Amos of Ellicott City, for petitioner/cross respondents.

J. Marcus Slowiak of Annapolis, for respondent/cross petitioner.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, JOHN C. ELDRIDGE, (Retired, Specially Assigned), IRMA S. RAKER, (Retired, Specially Assigned) and ALAN M. WILNER, (Retired, Specially Assigned), JJ.

HARRELL, J.

We are asked in this case to decide whether an *inter vivos* transfer, in which a deceased spouse retained control over the transferred property during his lifetime, constitutes a *per se* violation of the surviving spouse's statutory, elective right to a percentage of the deceased spouse's net estate under Maryland Code (1974, 2001 Repl.Vol., 2008 Cum.Supp.), Estates and Trusts Article, § 3–203.[1] The Circuit Court for Anne Arundel County held that it does not, concluding that the decedent did not intend to defraud his surviving spouse when he transferred assets to a revocable trust that he created for his daughter (by a prior marriage) and named that trust as the beneficiary of two IRA accounts. The Court of Special Appeals reversed the trial court in a reported opinion, *Schoukroun v. Karsenty*, 177 Md.App. 615, 937 A.2d 262 (2007), where it held that, although the trial court was not clearly

---

**1.** The amendments to Section 3–203 that are included in the 2008 Supplement became effective on 1 October 2003, applying to persons who died after that date. We cite to the 2008 Supplement; however, the law existed in its current form at all times pertinent to this litigation.

erroneous in finding that the decedent did not intend to defraud his surviving spouse, the decedent's retained control of the transferred assets rendered the transfer a fraud *per se* on the surviving spouse's marital rights.

We granted the trustee's Petition for a Writ of Certiorari. *Karsenty v. Schoukroun*, 404 Md. 152, 945 A.2d 1270 (2008). The successful petition posed the following question:

Whether Maryland has a bright-line rule establishing that in every case in which a deceased spouse has transferred property with a retained interest, the transfer constitutes a fraud on the surviving spouse's elective share regardless of motive, the extent of control, and other equitable factors?

For the reasons to be explained, we shall reverse the judgment of the intermediate appellate court; however, because we remain concerned by the apparent legal test applied by the trial court in its ruling, we shall direct remand of this case to the trial court with further guidance. As we shall explain, the body of precedents forming the doctrine that, until now, has been referred to as "fraud on marital rights" has really little to do with common law fraud as typically understood. We reject that phraseology as inconsistent with the weight of Maryland precedent. We also shall take this opportunity to clarify somewhat the applicable primary factors to consider when determining whether to set aside an *inter vivos* transfer that frustrates a surviving spouse's right to an elective share of the deceased spouse's estate.

## Facts

This case arises from a decedent's *inter vivos* distribution of his assets through the use of both probate and non-probate estate planning arrangements. On 10 October 1987, Gilles H. Schoukroun ("Gilles" or "Decedent") married his first wife, Bernadette.[2] The marriage produced one child, Lauren Schoukroun ("Lauren"), who was born on 20 April 1990. When Lauren was six years old, Gilles and Bernadette ended

---

2. For the sake of clarity and meaning no disrespect, we will refer to the persons involved in this case by their first names.

their marriage. A Judgment of Absolute Divorce was rendered on 5 September 1995 by the Circuit Court for Anne Arundel County. Before the divorce, however, Gilles and Bernadette entered into a separation agreement whereby they agreed to share custody of Lauren and agreed to pay the expenses of her care. The agreement also required Gilles and Bernadette each to maintain a life insurance policy in the amount of at least $150,000, naming Lauren as the beneficiary. Gilles, however, did not purchase such a policy.

Sometime in 1999, Gilles met Kathleen Sexton ("Kathleen") and, by October of that year, they became engaged to be married. Kathleen had been married previously and had a child from that marriage. In the Spring of 2000, before they married, Gilles and Kathleen took out life insurance policies from Zurich Kemper. Gilles purchased a policy on his life, naming Kathleen as the beneficiary, in the amount of $200,000.[3] Kathleen made her policy benefits payable to her estate in the amount of $200,000, with her son from her prior marriage as the beneficiary of her estate.[4] Gilles and Kathleen were married in Worcester County on 3 July 2000.[5] At the time, they were 40 and 45 years old, respectively.

On 29 January 2004, Gilles learned that he had lymphoma. He underwent chemotherapy and radiation treatment between then and September 2004. He experienced little success with the conventional treatments. His oncologist told him that he should consider a stem cell transplant. Gilles had the transplant in September 2004 and was declared cancer free by early October 2004. About two weeks later, however, he was admitted to the hospital in the middle of the night. Gilles died on 18 October 2004. At the time of his death, Gilles was 44

---

3. The trial judge noted that Gilles's life insurance policy was "in the amount of $250,000;" however, based on our review of the evidence of record, the court's statement appears to be a mistake.

4. Kathleen's will, executed in 1987, named her son as beneficiary of her estate. In December 2004, Kathleen amended her policy, naming her son as the express beneficiary.

5. Kathleen ultimately adopted Schoukroun as her married name.

years old and had been married to Kathleen for four years. Lauren, his and Bernadette's child, was 14 years old when Gilles died.

This case centers on the estate planning arrangements that Gilles made in the last three to four months of his life. On 23 June 2004, Gilles prepared and executed his Last Will and Testament and a document known as the Gilles H. Schoukroun Trust (the "Trust"). In his will, Gilles named his sister, Maryse Karsenty ("Maryse"), the Personal Representative of his estate. The will provided, "I give all my tangible personal property, together with any insurance providing coverage thereon, to my wife, KATHLEEN SEXTON . . . ." Gilles bequeathed the "rest, residue and remainder" of the estate to the Trust.

With respect to the Trust, Gilles named Lauren the beneficiary. He named himself settlor and trustee during his lifetime, and he appointed Maryse trustee upon his death. In the event Maryse could not serve as trustee, Gilles named Kathleen as the alternative trustee. Clause Two of the Trust provided:

> The Settlor reserves the right to amend or terminate this trust from time to time by notice in writing delivered to the Trustee during the lifetime of the Settlor, and any amendment or termination shall be effective immediately upon delivery thereof to the Trustee, except that changes with respect to the Trustee's duties, liabilities or compensation shall not be effective without its consent.

> Upon the death of the Settlor, this trust shall be irrevocable and there shall be no right to alter, amend, revoke or terminate this trust or any of its provisions.

Clause Three of the Trust, in pertinent part, provided:

> The Trustee shall pay the net income from this trust to or for the benefit of the Settlor during the Settlor's lifetime, in such annual or more frequent installments as the Trustee and the Settlor may agree, and the Trustee shall pay so much or all of the principal of the trust to the Settlor as he shall from time to time request in a signed writing delivered to the Trustee.

On the same day that he created the Trust, Gilles transferred into the Trust assets from three financial accounts: (1) one at E*Trade Financial, worth approximately $29,037.15; (2) one at Fidelity Investments, worth approximately $75,257.25; and (3) a second at Fidelity Investments, worth approximately $49,034.67. On 12 July 2004, Gilles named the Trust as the beneficiary of two IRA transfer-on-death ("TOD") accounts at Fidelity Investments, one worth approximately $257,863.31, the other worth approximately $14,069.51. It was clear that Fidelity managed the investments in the larger TOD account (there was no similar evidence offered as to the smaller). It appears from the record that Gilles took no distributions from either of the TOD accounts during his lifetime.[6]

When Gilles died, Lauren became the sole beneficiary of the Trust. Kathleen received the $200,000 proceeds from Gilles's Zurich Kemper life insurance policy. In accordance with Gilles's will, Kathleen also received his 2003 Toyota Highlander, the outstanding loan balance for which he had recently paid off. The vehicle was valued at approximately $22,000.

On 2 February 2005, Gilles's will was admitted to administrative probate by the Orphans' Court in Anne Arundel County. Kathleen renounced Gilles's will and, on 17 February 2005, filed an election to take a statutory share of Gilles's estate under Section 3–203 of the Estates and Trusts Article of the Maryland Code. Shortly thereafter, Kathleen filed a complaint against Maryse, as trustee of the Trust, and Bernadette, as Lauren's guardian, in the Circuit Court for Anne Arundel County claiming fraud on her marital rights and constructive fraud. That action is the genesis of the present litigation. In short, Kathleen alleged that, despite the Trust's non-probate nature, Gilles retained lifetime dominion and control over the Trust, its assets, and the TOD accounts, of which the Trust was the beneficiary, thereby unlawfully depriving

---

**6.** Except for the E*Trade account, which reflects a November 2004 valuation, the accounts information reflects the value of each account as of 30 September 2004.

her of her statutory share of his net estate. Kathleen principally relied on *Knell v. Price*, 318 Md. 501, 569 A.2d 636 (1990). *Knell* applied the doctrine, heretofore referred to as fraud on marital rights, to invalidate a decedent's *inter vivos* property transfer to his live-in companion because the decedent retained possession and absolute control of the property during his life. Kathleen argued that *Knell* established a bright-line rule that absolute control of property by a decedent spouse is a *per se* fraud on a surviving spouse's marital right to an elective share of the decedent's estate. Alternatively, she argued that, absent the *per se* rule, the factual circumstances of this case necessitated the conclusion that the Trust and the TOD accounts should be set aside as frauds on her marital rights. Kathleen sought to have the Court impose a constructive trust on the funds in the Trust.

Bernadette, on Lauren's behalf, filed a counterclaim against Kathleen requesting that a constructive trust be imposed on the proceeds from Gilles's Zurich Kemper life insurance policy. Bernadette alleged that the proceeds properly were Lauren's because Gilles had an obligation, under the terms of the 1999 separation agreement, to purchase and maintain a life insurance policy for Lauren's benefit and that he failed to do so.[7]

During a two-day bench trial, Kathleen testified that, during Gilles's illness, she frequently took him to his medical appointments and assisted him in other respects. She claimed that she did not know that Gilles had a prior obligation to maintain a life insurance policy for Lauren's benefit and that, although she was aware that Gilles created a will and a trust, she did not know the details of either.

Kathleen explained that, during their marriage, the couple lived in her home in Crofton, Maryland, and that Gilles paid

---

7. Bernadette, on Lauren's behalf, also filed in the Orphans' Court a creditor's claim against the estate seeking $150,000 in lieu of the life insurance policy that Gilles failed to maintain for Lauren. The Orphans' Court allowed the claim on 4 May 2005. The Court of Special Appeals affirmed the orphans' court decision in an unreported opinion. That judgment is not directly part of the present litigation.

her $1,200 dollars per month to assist her with her mortgage. The trial judge found that:

> [T]hey maintained essentially separate financial lifestyles. He worked. She worked. He had accounts. She had accounts. They had a joint account. But essentially it was like I have my house, you're living here, you pay—he paid her $1,200 a month that she used to pay the mortgage. They really didn't commingle their funds to any great extent.

There was testimony, however, that Gilles and Kathleen, beginning in October 2001, discussed separating at various times.

In addition to the $200,000 life insurance policy proceeds and the Toyota Highlander that she received under Gilles's will, Kathleen testified that she also received $12,680.91 as a death benefit from a thrift savings plan. Furthermore, Kathleen acknowledged that, before Gilles died, he paid $17,000 to satisfy fully the balance due on her car loan.

Besides the arrangements that Gilles made for her, Kathleen described her general financial status. When Gilles died, she was working as the Director of the Admissions and Records Office at the Prince George's Community College, earning approximately $74,000 annually. Since his death, she accepted a new position in the College's Continuing Education Division and began earning $79,519 annually. She receives a pension from the Maryland State Teachers Retirement Association, has a mutual fund account consisting of approximately $16,000, and the house she owns is worth an estimated $450,000, though subject to a mortgage of $113,000 at the time of trial.

In addition to becoming the beneficiary of the Trust, which the trial court valued at approximately $422,000 at the time of Gilles's death,[8] testimony revealed that Lauren receives ap-

---

8. The court also found that, by the time of the trial, the value of the Trust's assets had risen close to $450,000 due to investment and growth.

proximately $900 a month as a survivor benefit from Gilles's U.S. Air Force pension and approximately $1,200 a month from Social Security.

At the conclusion of the receipt of evidence, the trial judge resolved Kathleen's claims against her and denied Bernadette's request for the imposition of a constructive trust on the insurance proceeds received by Kathleen. Regarding Kathleen's claims, the trial judge rendered the following findings of fact and conclusions of law:

Let me tell you that I find as a matter of fact that there is no fraud on the part of Mr. Gilles Schoukroun in the creation of this trust, actual or even constructive fraud. I find no actual fraud whatsoever. And I find no constructive fraud.

I am impelled in that direction by a number of things. First of all, his actions took place at a time when he knew he was sick. Now I can't say I knew he was dying because after the stem cell transplants, they gave him good news for 20 or 30 minutes. So I don't know. Its not proven to me what he knew at the time.

What I do know is he knew he was sick. And he had been sick for some period of time. So that when—and when he sat down to draw this last will and testament and this trust, I have to find that he knew exactly what he was doing *vis-à-vis* his assets.

It is apparent that what he was doing was setting up a trust for Lauren.... Interestingly enough, when he drew both the trust and his will, he set up Ms. Karsenty as the trustee and the personal representative. But if she were unable to serve or declined to serve, he set up the plaintiff as the trustee and/or personal representative, which tells me that he certainly wasn't trying to defraud Ms. Sexton. In fact, quite the contrary, he was in reliance on her. He relied on her. He intended to rely on her if he had to, if it became necessary, if his sister couldn't serve.

It doesn't sound like the actions of somebody who is trying to defraud another. And everything I've heard about

this man, this estate, these trusts, imply or tells me that he was trying to cover all bases. He was trying to cover everybody. Now what he didn't do is, of course, he didn't take out an insurance policy that he was supposed to take out.

But let me finish up. It is urged upon me that I find *Knell versus Price* in the Court of Appeals establishes a *per se* guideline for fraud in cases where one spouse disposes of their property by means of, in this case, a trust and, in setting up that trust, sets up a revocable trust, which gives them absolute control up through and to the time of their death, that that is *per se* a fraud upon the marital rights of their then-existing spouse.

Now while I think that's what Judge Orth said in *Knell versus Price,* I think I agree with [Bernadette's attorney] that, while it may not be the clearest thing you can read, but he says I'm talking about this case, I'm talking about these facts. And the facts in that case were that Mr. Knell strawdeeded the property out and strawdeeded it back. And the net result was he ended up with a life estate in which he had reserved to himself the absolute powers of disposition up until the time of his death.

But I read that to refer to that case and that case alone, those facts and those facts alone. A deed, a deeded situation of real property. It is not real clear, but that's what I read.

This is a case, however, of a [revocable] trust, a very common way of handling one's estate prior to death to avoid the testamentary laws, very common . . . .

Anyway, I don't think *Knell versus Price* controls this case. I do not think that the creation of a revocable trust to the benefit of one's child, and admittedly in derogation of the estate, and as a consequence of the wife, her one-third entitlement, is a *per se* act of fraud. If I'm wrong in that, it should be very easy to reverse me.

Also, as a I said earlier, I reiterate I find no instance, no instance, of fraudulent conduct on the part of Mr. Schouk-

roun in dealing with Kathleen Sexton Schoukroun. So I decline—I find for all defendants in the complaint.

As observed *supra*, the trial court also denied the constructive trust that Bernadette requested be placed on the insurance proceeds paid to Kathleen.

Kathleen and Bernadette, respectively, appealed to the Court of Special Appeals, which reversed the trial court's disposition of Kathleen's claim of fraud on her marital rights and affirmed the trial court's denial of Bernadette's request for a constructive trust.[9] In its reported opinion, the intermediate appellate court reasoned as follows:

The circuit court was not clearly erroneous in finding that Mr. Schoukroun had not acted with the intent to defraud his widow or his daughter. That finding, however, is not of dispositive consequence to Kathleen's appeal. Kathleen relies on *Knell v. Price*, 318 Md. 501, 569 A.2d 636 (1990), for the proposition that—as a matter of law—a deceased spouse's transfer of property during the marriage constitutes fraud on marital rights of the surviving spouse *whenever*, as is the situation in the case at bar, the "transfer" was not "complete, absolute, and unconditional." . . . .

We are persuaded that Kathleen's interpretation of *Knell* is correct. We therefore hold that Mr. Schoukroun's decision to retain the power to revoke the Trust requires that the assets of the Trust be included in his estate for purposes of calculating Kathleen's statutory share.

The *Knell* decision also applies to the financial accounts that were to be transferred to the Trust upon Mr. Schoukroun's death.

. . . .

During his life, Mr. Schoukroun retained the power to alter the beneficiary of the financial accounts he owned at Fidelity Investments. As we interpret the holding in *Knell*, even though the circuit court was not clearly erroneous in

---

**9.** Bernadette did not seek our review of the intermediate appellate court's judgment with respect to her request for a constructive trust.

finding that none of Mr. Schoukroun's actions were undertaken with a "fraudulent intent," the assets in those accounts must also be included in his estate for purposes of calculating Kathleen's statutory share.

*Schoukroun,* 177 Md.App. at 631–34, 937 A.2d at 272–73.

We granted Maryse's Petition for a Writ of Certiorari to determine whether the intermediate appellate court erred in holding that a decedent's *inter vivos* property transfer is a *per se* fraud on her or his surviving spouse's marital rights where the decedent retained dominion and control over the transferred property during her or his lifetime. *Karsenty v. Schoukroun,* 404 Md. 152, 945 A.2d 1270 (2008).[10] We also granted Kathleen's Conditional Cross–Petition for a Writ of Certiorari to determine whether the intermediate appellate court erred as a matter of law in holding that the trial court was not clearly erroneous in finding that Gilles did not intend to perpetrate a fraud on Kathleen's marital rights. *Id.*[11]

---

10. The question presented in Bernadette's Petition was:

Whether Maryland has a bright-line rule establishing that in every case in which a deceased spouse has transferred property with a retained interest, the transfer constitutes a fraud on the surviving spouse's elective share regardless of motive, the extent of control, and other equitable factors?

11. Kathleen's Conditional Cross–Petition presented three questions:

1. Did the Court of Special Appeals err as a matter of law in holding that the assets of the Trust be included in his estate for purposes of calculating Kathleen's statutory share but not included in the estate for passage through the rest residue and remainder[?]

2. Did the Court of Special Appeals err as a matter of law in finding that the Circuit Court was not clearly erroneous in finding that Mr. Schoukroun had not acted with the intent to defraud his widow?

3. Should the Court of Appeals clarify the holding of the Court of Special Appeals to state clearly that a constructive trust was imposed on the assets in the revocable trust and that the assets of the trust should be listed on the Orphans' court accounting so that the statutory share can be computed?

We shall address only the second question in the Conditional Cross–Petition. The first question is meaningless in this case because, as Kathleen's counsel acknowledged, Gilles devised the rest, residue and remainder of his estate to the Trust. Thus, the result will be the same in this case regardless of whether the Trust assets return to the estate or whether they are considered only for the purpose of calculating Kath-

## Analysis

### I.

 Kathleen renounced her inheritance under Gilles's will and invoked her right to an elective share of his estate, which she contends should include the Trust and the TOD accounts. Accordingly, the starting point of our analysis of her claims is Maryland's elective share statute, Maryland Code (1974, 2001 Repl.Vol., 2008 Cum.Supp.), Estates and Trusts Article, § 3–203.[12] As we have noted, the "right of a spouse to take a share of an Estate in contravention of a Will ... [is] entirely statutory." *Downes v. Downes*, 388 Md. 561, 573, 880 A.2d 343, 350 n. 5 (2005). Section 3–203(b) provides:

> Instead of property left to the surviving spouse by will, the surviving spouse may elect to take a one-third share of the net estate if there is also surviving issue, or a one-half share of the net estate if there is no surviving issue.

In other words, a surviving spouse, who is dissatisfied with her or his inheritance, has the right to "receive an elective share of the decedent's estate, regardless of the provisions contained in the decedent's will." *Shimp v. Huff*, 315 Md. 624, 645–46, 556 A.2d 252, 263 (1989).

 When construing a statute, we are mindful that "[i]f the language is clear and unambiguous, we ordinarily 'need not look beyond the statute's provisions and our analysis ends.'" *Opert v. Criminal Injuries Compensation Bd.*, 403 Md. 587, 593, 943 A.2d 1229, 1233 (2008) (quoting *Barbre v. Pope*, 402 Md. 157, 172, 935 A.2d 699, 708 (2007)). In *Downes*, we considered the statutory provision for extending the time

---

leen's statutory share. We need not address the third question in Kathleen's Conditional Cross–Petition because we shall reverse the judgment of the Court of Special Appeals and remand this case for further proceedings in the trial court. Kathleen may press there her claims implicit in her third question, in the event that she succeeds in having the Trust and/or the TOD accounts set-aside.

**12.** Unless otherwise provided, all statutory references are to Maryland Code (1974, 2001 Repl.Vol., 2008 Cum.Supp.), Estates and Trusts Article, § 3–203.

within which a surviving spouse must choose whether to elect against a will. 388 Md. at 565, 880 A.2d at 345. We held there that the Orphans' Court did not possess the authority to grant an extension after the time provided for in the statute expired. *Id.* In construing that statute, we stated:

We have stated the controlling principles of statutory construction so often that only the briefest exposition is necessary. Our predominant mission is to ascertain and implement the legislative intent, which is to be derived, if possible, from the language of the statute (or Rule) itself. If the language is clear and unambiguous, our search for legislative intent ends and we apply the language as written in a common sense manner.

*Id.* at 571, 880 A.2d at 349.

Section 3–203 is clear and unambiguous with respect to the Trust and the TOD accounts in this case. The term "net estate," as it is used in Maryland's elective share statute, "means the property of the decedent passing by *testate succession.*" Estates and Trusts Art. § 3–203(a) (italics added). This includes only property in which the decedent "has some interest . . . which will survive his death." 1 PAGE ON THE LAW OF WILLS § 16.10 (2003).[13] Here, the Trust and the TOD accounts fall outside the definition of "net estate" because Gilles did not have any interest in either that survived his death. When Gilles created the Trust, Lauren received a vested, albeit revocable, interest therein; accordingly, Lauren became the sole beneficiary of the Trust by operation of law when Gilles died. *See Shaffer v. Lohr,* 264 Md. 397, 407, 287 A.2d 42, 48 (1972). Likewise, the TOD accounts transferred to the Trust upon Gilles's death "by reason of the contract" between him and Fidelity Investments with which the accounts were registered. *See* Maryland Code (1974, 2001 Repl.

---

**13.** In other words, "net estate" does not include assets that are disposed of by "non-probate arrangements—such as living trusts, life insurance, joint ownership, and retirement." Angela M. Vallario, *Spousal Election: Suggested Equitable Reform for the Division of Property at Death,* 52 CATH. U.L.REV. 519, 536 (2003).

Vol.), Estates and Trusts Article § 16–109(a). Thus, by its plain language, Section 3–203 does not permit Kathleen to take a share of the Trust assets or the TOD accounts.

We must respect the "net estate" model chosen by the General Assembly. Many of our sister states, however, have taken a different approach with respect to their elective share statutes, adopting some form of the "augmented estate" concept. Although there are differences between the models adopted by the various augmented estate jurisdictions, the pith of the augmented estate concept is that a surviving spouse's elective share is calculated by including non-probate assets over which the decedent had dominion and control during her or his lifetime. *See, e.g.,* DEL.CODE ANN. tit. 12, § 902 (West 2008); N.J. STAT. ANN. § 3B:8–3 (West 2008); N.Y. EST. POWERS & TRUSTS LAW § 5–1.1–A(b)(1) (West 2008); 20 PA. CONS.STAT. § 2203(a) (West 2008).[14]

■ Although Kathleen urges that we decide this case, ostensibly, under the doctrine previously referred to as fraud on marital rights, what she seeks is to establish dominion and control by the decedent during his life as the sole touchstone for determining whether a non-probate asset will be included in the pool of assets that are subject to the elective share. In effect, if we were to hold that dominion and control (even absolute control) is *per se* fraud on marital rights, as Kathleen urges, we would be imposing, by judicial fiat, a kind of augmented estate model eschewed by the Legislature. *See Alavez v. MVA*, 402 Md. 727, 737, 939 A.2d 139, 145 (2008) (commenting that the Legislature provided only two exceptions to the statute requiring reciprocity for the suspension of

---

14. *See also* HELENE S. SHAPO ET AL., TRUSTS & TRUSTEES § 211 (3d ed. 2007) ("Among the nonprobate assets included in the augmented estate are the assets of a trust as to which the deceased spouse had retained the power to revoke or to withdraw trust assets."); Vallario, *Spousal Election, supra,* at 544 ("The Augmented Estate Elective Share Method was created ... to enhance the protection of the surviving spouse by statutorily adding to the decedent's estate all transfers that the decedent made during his lifetime, over which the decedent had dominion and control.").

an out-of-state driver's license and that "[i]t is not for this Court, by judicial fiat, to add another one"). Such a result would allow a surviving spouse to incorporate all non-probate assets, over which the decedent had control during her or his lifetime, into the elective share asset pool, regardless of the circumstances of the underlying *inter vivos* transfer. This we shall not endorse. The net estate, not an augmented estate, is the model provided for by the clear and unambiguous language of Section 3–203, and we must be cognizant of that model when scrutinizing non-probate estate planning arrangements like those at issue in this case. *See* Melvin J. Sykes, Inter Vivos *Transfers in Violation of the Rights of Surviving Spouses*, 10 MD. L.REV. 1, 3 (1949) (noting that the problem of determining what is and is not a fraud on a surviving spouse's marital rights "technically, is one of statutory interpretation").[15]

Nonetheless, Maryland precedent long has recognized that a court may invalidate a deceased spouse's *inter vivos* transfer where equity requires that the transferred property be considered part of her or his estate for the purpose of calculating the surviving spouse's statutory share. *E.g., Knell,* 318 Md. at 512, 569 A.2d at 641; *Jaworski v. Wisniewski,* 149 Md. 109, 120, 131 A. 40, 44 (1925); *Hays v. Henry,* 1 Md. Chan. 337, 341 (1851). To determine whether equity requires that a transfer be set aside, a court must ask whether the decedent intended to part with ownership of the property in form only, while remaining the true owner of the property during her or his lifetime; if the decedent intended that the transfer divest her or him of ownership in form, but not in substance, the transaction unlawfully frustrates the statutory protection of the decedent's surviving spouse and, accordingly, is invalid.

---

**15.** We note that, on three occasions, the General Assembly considered adopting an augmented estate model, but declined to do so. *See* HB 265 (2000); HB 780 (1999); HB 665 (1997). In 1997 and 1999, the House Judiciary Committee voted unanimously to give the proposed bills unfavorable recommendations. The 2000 bill faired slightly better, with one committee member opposing the unfavorable recommendation.

*See Winters v. Pierson,* 254 Md. 576, 584–85, 255 A.2d 22, 26–27 (1969); *Allender v. Allender,* 199 Md. 541, 549, 87 A.2d 608, 611 (1952); *Mushaw v. Mushaw,* 183 Md. 511, 519, 39 A.2d 465, 468–69 (1944).

Kathleen urges that our opinion in *Knell v. Price,* 318 Md. 501, 569 A.2d 636 (1990), established a "bright-line" or *per se* rule that a decedent's absolute dominion over and control of an asset during the decedent's lifetime will cause that asset's non-probate disposition to be set aside as violative of the surviving spouse's marital rights because such a transfer is merely colorable. We disagree. In fact, we acknowledged in *Knell* that "[i]t may be that '[n]o general and completely satisfactory rule to determine the validity or invalidity of transfers alleged to be in fraud of marital rights has yet been evolved in this State.'" 318 Md. at 512, 569 A.2d at 641 (quoting *Whittington v. Whittington* 205 Md. 1, 14, 106 A.2d 72, 78 (1954)). Kathleen's premise—that a colorable transfer is invalid as to a surviving spouse electing against a will—is correct; however, retention of dominion and control alone (even if absolute) does not necessitate, in all cases, a finding that a transfer is merely colorable. The pertinent case-law makes clear that all of the relevant facts and circumstances should be considered and a determination made on a case-by-case basis. *See Winters,* 254 Md. at 581, 255 A.2d at 24 ("If any conclusion can be drawn from our prior decisions, it is that questions like those here presented must be resolved on a case-by-case basis."); *Sturgis v. Citizens' Nat'l Bank of Pocomoke City,* 152 Md. 654, 660, 137 A. 378, 381 (1927) ("[R]eservations of right or dominion ... might properly be considered in connection with other facts to determine whether there has been a fraudulent use of the form of gift...."); *Feigley v. Feigley,* 7 Md. 537, 562 (1855) ("[W]e ... must call to our aid every fact, however remote and trivial it may be, which can throw light upon the subject.").[16] Moreover, we long have recognized that an *inter*

---

16. *See also Gianakos v. Magiros,* 234 Md. 14, 32, 197 A.2d 897, 907 (1964) ("We are trying to take all equitable considerations fairly into account...."); *Collins v. Collins,* 98 Md. 473, 484, 57 A. 597, 601

*vivos* transfer in which a decedent retained sole lifetime control over the transferred property is not, by itself, violative of the surviving spouse's statutory share. *E.g., Winters,* 254 Md. at 585, 255 A.2d at 27 (joint savings and checking accounts subject only to withdrawal by the decedent); *Bestry v. Dorn,* 180 Md. 42, 44–45, 22 A.2d 552, 553 (1941) (a leasehold interest in which the decedent retained the right to "mortgage, sell or otherwise dispose of or encumber"). Stated simply, "retention of control does not in and of itself make the transaction a sham. . . ." *Gianakos v. Magiros,* 234 Md. 14, 32, 197 A.2d 897, 906 (1964). Even more to the point, we held that a revocable *inter vivos* trust is not an actionable frustration of a surviving spouse's statutory rights unless the circumstances indicate that there was an improper use of the trust form. *Mushaw,* 183 Md. at 519, 39 A.2d at 468; *Sturgis,* 152 Md. at 660, 137 A. at 381; *Brown v. Fid. Trust Co.,* 126 Md. 175, 179–80, 94 A. 523, 524 (1915).

In *Brown v. Fid. Trust Co.,* we refused to set aside a revocable *inter vivos* deed of trust as violative of a surviving spouse's rights because we concluded that the deed was a "complete and bona fide transfer. . . ." 126 Md. at 184, 94 A. at 526. There, the decedent conveyed to a trust company "stock and bond securities and cash money, amounting to about $33,550, . . . to be held in trust for the uses and purposes and with the powers [ ] set out in the deed." *Id.* at 177, 94 A. at 524. Like Gilles, the decedent in *Brown* retained a life estate in the trust income and the power to revoke the trust at any time. *Id.* at 178–79, 94 A. at 524.[17] During the decedent's

_____

(1904) ("[T]he questions thus presented are left open for future consideration as they may arise.").

**17.** The trust terms gave the decedent "the right to revoke [the trust] at any time upon giving the trustee 30 days' written notice . . . acknowledged before a notary public. . . ." *Brown,* 126 Md. at 179, 94 A. at 524. In the present case, however, Gilles had the right to revoke the Trust at any time, as long as he did so in writing. This does not mean that the trust in *Brown* was somehow less revocable than the Trust in this case; it means that the decedent simply needed to execute her revocation in

lifetime, the trustee was to "pay over the entire net income to [the decedent], . . . as she may request from time to time." *Id.* at 178, 94 A. at 524. Upon her death, the trustee was to pay $50 per month from the trust's net income to her surviving husband for the rest of his life, and then $50 per month to the decedent's sister and brother. *Id.* at 178, 94 A. at 524. The deed directed the trustee to disburse the corpus and remaining income to various charitable organizations following the death of the sister and brother. *Id.* at 178–79, 94 A. at 524. On these facts, we held that the decedent's *inter vivos* deed of trust was "a complete and bona fide transfer of the property . . . for the purposes named therein." *Id.* at 184, 94 A. at 526. In our analysis, although we did not discuss specifically the decedent's life estate or right of revocation, we observed that all of the terms of the deed were reasonable and allowed that consideration to guide our analysis. We stated:

> We have thus set out somewhat at length the terms and provisions of the deed because, we think, the reasonable character of the provisions of the deed itself will reflect upon a proper conclusion, in the discussion and determination of the questions, in this case.

*Id.* at 179–80, 94 A. at 524.

*Brown* makes clear two significant points: (1) a revocable *inter vivos* trust with a retained life estate may be a complete and bona fide transfer and, thus, is not necessarily invalid with regard to a surviving spouse; and (2) when rights are reserved, the reasonableness of the terms is an important consideration. "To hold that either a husband or wife has a vested interest in the others's personalty that the one is unable to divest in his or her lifetime would be disastrous in the extreme to trade and commerce." *Id.* at 185, 94 A. at 526.[18]

---

accordance with the procedure described in the trust document. *See id.* at 183, 94 A. at 526.

**18.** *Brown* attributes this quote to *Dunnock v. Dunnock,* 3 Md. Chan. 146 (1853); however, we are unable to find this language in the text of *Dunnock.*

In *Mushaw v. Mushaw*, we invalidated trust accounts that we concluded unlawfully frustrated a surviving spouse's right to an elective share of her deceased husband's estate; however, we reiterated that the power to revoke a trust, in and of itself, does not make for an improper frustration of that right. 183 Md. at 519, 39 A.2d at 468–69. In *Mushaw*, the decedent was a trustee and beneficiary of the trust accounts, from which only he could withdraw funds during his lifetime. *Id.* at 516, 39 A.2d at 467. We observed that his right to make withdrawals, while the other beneficiaries could not, was "in legal contemplation no more than a power to revoke the trust." *Id.* at 515–16, 39 A.2d at 467. We said that this power alone does not prevent a trust from being complete and bona fide as to a surviving spouse; however, it "might properly be considered in connection with other facts" to determine whether a decedent's use of the trust form unlawfully frustrates the rights of her or his surviving spouse. *Id.* at 517, 39 A.2d at 467 (quoting *Sturgis*, 152 Md. at 660, 137 A. at 381). In *Mushaw*, the "salient fact" was the extent to which the decedent's trust accounts stripped his surviving wife of the personal property that otherwise would have been part of his estate. *Id.* Accordingly, we invalidated the accounts as to her interest. *Id.* at 519, 39 A.2d at 469.

In *Whittington v. Whittington*, however, we refused to invalidate trust accounts established and solely controlled by the decedent during his lifetime. 205 Md. 1, 14, 106 A.2d 72, 78 (1954). Although the trust accounts were joint accounts in name, the decedent made explicit that "he didn't want [the beneficiaries] to use the money until after his death." *Id.* at 7, 106 A.2d at 75. Moreover, the decedent kept the passbooks for the accounts in a "lock box," which remained in "his possession for the remainder of his life." *Id.* In other words, for all intents and purposes, the decedent retained absolute dominion and control over the trust accounts. In upholding the validity of the of the trust accounts, we explained:

> In Maryland, the completeness of the transfer and the extent of control retained by the transferor, the motive of the transferor, participation by the transferee in the alleged

fraud and the degree to which the surviving spouse is stripped of his or her interest in the estate of the decedent have all been considered material, and no one test has been adopted to the exclusion of all other tests.

*Id.* at 12, 106 A.2d at 77. We held that the use of the trust form was not improper as to the surviving spouse in light of the other provisions that the decedent made for her and the relationship that the decedent enjoyed with his sons, who were the beneficiaries of the trust accounts. *Id.* at 14, 106 A.2d at 78.

In *Gianakos v. Magiros,* we refused to invalidate a decedent's *inter vivos* transfer of restaurant property to his son from a previous marriage. 234 Md. at 31–32, 197 A.2d at 906. We emphasized "that retention of control does not in and of itself make the transaction a sham" and concluded that the decedent had "a sound business reason" for retaining a life estate with the power "to lease, mortgage, deed or in any other wise encumber the property absolutely." *Id.* at 30–32, 197 A.2d at 906.[19] We said unequivocally in *Gianakos* that *Whittington* provides "controlling rules." *Id.* at 29, 197 A.2d at 905. Moreover, in *Winters v. Pierson,* we refused to invalidate a number of checking and savings accounts that a decedent established for the benefit of his grandchildren and great-grandchildren, even though most of the accounts "were subject to withdrawal only by [the decedent]." 254 Md. at 580–85, 255 A.2d at 24–27. We reiterated that there is no single determinative factor and concluded that the accounts established for the grandchildren and great-grandchildren were "not only understandable but legitimate." *Id.* at 585, 255 A.2d at 27.

---

**19.** We did note, however, that, from the context, the decedent's reserved power to "deed" appeared "to be limited by the words 'or in any other wise encumber,' and hence not to be a power to sell or give away the property. It may have been intended to apply to a deed of trust in the nature of a mortgage." *Gianakos,* 234 Md. at 30–31, 197 A.2d at 906. In any event, this qualification did not play a meaningful part in reaching our conclusion that the decedent's transfer of property to his son was not an unlawful frustration of the surviving spouse's right to a percentage of his estate. *See id.* at 31–33, 197 A.2d at 906–07.

Kathleen places much stock in her view of *Knell, supra,* 318 Md. 501, 569 A.2d 636; however, *Knell* added nothing new to the analytical paradigm. The decedent in *Knell* was estranged from his wife and living with a woman for whom he justifiably had a great deal of affection. *Id.* at 502–03, 569 A.2d at 637. The decedent's live-in companion "served as his nurse during his illness, homemaker, cook, and companion," and she had lived with the decedent for 27 years following his separation from his wife. *Id.* To secure for her an interest in his real property, the decedent deeded the property to a strawman, who deeded it back to the decedent as a life estate, with the remainder vested in fee simple in the decedent's live-in companion. *Id.* at 503–04, 569 A.2d at 637. The strawman's deed to the decedent also gave the decedent the absolute power to dispose of the property, including the remainder. *Id.* Following this transaction, the decedent and his live-in companion continued to live together on the property as if nothing had changed. *Id.* In other words, despite the decedent's noble intentions, the transaction was a sham. We stated:

> It may be that "[n]o general and completely satisfactory rule to determine the validity or invalidity of transfers alleged to be in fraud of marital rights has yet been evolved in this State." *Whittington,* 205 Md. at 14, 106 A.2d 72. *See Klosiewski v. Slovan,* 247 Md. 82, 88, 230 A.2d 285 (1967). But here, it is perfectly clear that Mr. Knell retained control of the property during his lifetime by establishing a life estate in himself with unfettered power in him, while living (except by will), to dispose of all interests in the property in fee simple. He did not part with the absolute dominion of the property during his life. His conveyance, through a straw man, of the remainder of the property was not complete, absolute, and unconditional. The law pronounces this to be a fraud on the marital rights of Mrs. Knell. His reluctance to relinquish control over the disposition of the property during his lifetime defeated his intention.

*Id.* at 512, 569 A.2d at 641–42 (alterations in original). Put simply, on these facts, we did not need to articulate a comprehensive rule because the outcome was clear to us.

There are two reasons why we believe that the holding in *Knell* was limited to its facts and did not establish a new analytical template for determining whether a surviving spouse may set aside a decedent's *inter vivos* transfer. First, since the turn of the twentieth century, this Court has upheld transactions in which decedents retained absolute control over their non-probate assets, and, when we have allowed a surviving spouse to invalidate a non-probate disposition of property, we have required her or him to do more than simply demonstrate that the decedent retained lifetime control of the property. *See, e.g., Whittington,* 205 Md. at 14, 106 A.2d at 78; *Mushaw,* 183 Md. at 519, 39 A.2d at 468; *Brown,* 126 Md. at 179–80, 94 A. at 524. Thus, for *Knell* to have announced a new rule, *Knell* would have had to overrule the old and well-established rule to the contrary. Nowhere in the *Knell* opinion did we reject (explicitly or implicitly) the prior precedents of this Court.[20] Second, *Knell* involved a peculiar and different set of facts than here; we were not dealing there with a revocable *inter vivos* trust or with trust accounts. In *Knell,* the decedent structured a two-part transaction, through a strawman, whereby he retained not just absolute control of his real property, but continued possession and use of it as well. *Knell,* 318 Md. at 512, 569 A.2d at 641–42. Indeed, such

---

**20.** For an example where a different result obtained, the Supreme Judicial Court of Massachusetts broke its adherence to the older, traditional rule represented in cases like *Brown* and *Whittington.* In *Sullivan v. Burkin,* that court wrote:

We announce for the future that, as to any inter vivos trust created or amended after the date of this opinion, we shall no longer follow the rule announced in *Kerwin v. Donaghy* [, 317 Mass. 559, 59 N.E.2d 299 (1945)]. There have been significant changes since 1945 in public considerations bearing on the right of one spouse to treat his or her property as he or she wishes during marriage.

390 Mass. 864, 871–72, 460 N.E.2d 572, 577 (1984). In *Knell,* however, we simply stated the rule that we have followed consistently for more than a century and applied it to the facts at hand. 318 Md. at 510–12, 569 A.2d at 640–42.

transactions have been disapproved of since at least the mid-nineteenth century, *see Hays*, 1 Md. Chan. at 341, and that propensity has not encroached on this Court's general protection of legitimate non-probate arrangements under which decedents may retain total control of their non-probate property until death. *See generally Winters*, 254 Md. at 585, 255 A.2d at 27; *Brown*, 126 Md. at 179–80, 94 A. at 524.

In *Gianakos*, we said that "[a]n excursion into the law of other jurisdictions seems neither necessary nor helpful in the solution of the problem before us." 234 Md. at 29, 197 A.2d at 905. Nonetheless, we find the D.C. Court of Appeals's decision in *Windsor v. Leonard*, 475 F.2d 932 (D.C.Cir.1973) (per curiam), to be persuasive in its interpretation of Maryland law on the point that a decedent's retained control over an asset, by itself, does not require a court to invalidate the transfer as to the decedent's surviving spouse. In *Windsor*, a surviving husband attempted to invalidate, as an unlawful frustration of his right to take a statutory share of the net estate under D.C.'s equivalent of Section 3–203, an *inter vivos* trust established by his deceased wife. 475 F.2d at 933.[21] The court noted that Maryland case law provided the "proper basis" for disposing of the issue before it. *Id.* "In enacting the D.C.Code provisions on marital rights, Congress made it clear that courts interpreting those provisions should follow precedents under the similar Maryland statute." *Id.* (citing H.R.Rep. No. 679, 87th Cong., 1 st Sess., p. 3, and S.Rep. No. 822, 87th Cong., 1 st Sess., p. 3). The court echoed what we said in *Gianakos*—that *Whittington* "set forth certain 'controlling rules' to be applied in determining whether or not an inter-vivos transfer is an improper circumvention of the marital

---

**21.** The relevant provision of the D.C.Code currently provides:
> The legal share of a surviving spouse or surviving domestic partner under subsection (a) or (d) of this section is such share or interest in the real or personal property of the deceased spouse or deceased domestic partner as he would have taken if the deceased spouse or deceased domestic partner had died intestate, not to exceed one-half of the net estate bequeathed and devised by will.

D.C.CODE § 19–113e (2001).

rights of the surviving spouse." *Id.* (quoting in part *Giana-kos,* 234 Md. at 29, 197 A.2d at 905). The D.C. appellate court affirmed the decision of the trial court not to invalidate the trust. *Id.* In doing so, the court held:

> In creating the trust, Mrs. Windsor reserved, in addition to the power of revocation, the right to all income during her lifetime, the right to draw from the principal, and the right to amend the terms of the trust. These powers, however, have not been held to render an otherwise valid transfer "incomplete" in cases such as this. There is no evidence to indicate that Mrs. Windsor or the beneficiaries of the trust had any unusual or fraudulent motive for the transaction. Mrs. Windsor created the trust at the age of fifty-four, some 18 months before she died; this is hardly the kind of "brink of death" transfer that might indicate bad faith on the part of the transferor. Finally, [the surviving spouse] is left with an estate exceeding $100,000 in addition to his personal holdings worth some $140,000.

*Id.; see also White v. Sargent,* 875 A.2d 658, 663 (D.C.2005) (applying *Whittington* as adopted in Windsor and invalidating an *inter vivos* trust that the decedent created to conceal his assets from his wife).

We also find the opinion of the Supreme Court of Illinois in *Johnson v. La Grange State Bank,* 73 Ill.2d 342, 22 Ill.Dec. 709, 383 N.E.2d 185 (1978), to be illustrative because its conclusion was premised on facts substantially similar to those at issue here and because we believe that Maryland precedents dictate that we interpret the law of this State the way that the *Johnson* court interpreted the law of Illinois.[22] In *Johnson,* the decedent learned that she had cancer, and, seven months before she died, she "executed a revocable Inter vivos trust in which she placed in trust substantially all of her assets." 73 Ill.2d at 350, 22 Ill.Dec. 709, 383 N.E.2d at 188.

---

**22.** As we will explain in Section II *infra,* the proper focus, as revealed by relevant Maryland case-law, is on the nature of the assailed *inter vivos* transfer. Accordingly, courts must ask whether such a transfer was intended to be a sham. *Johnson* emphasizes a similar focus.

Like Gilles, the decedent in *Johnson* named herself as trustee, and she retained a life estate in the trust income with the "power to invade the principal of the trust, as she in her discretion saw fit." *Id.* Upon the decedent's death, the successor trustee was to distribute the trust assets among the decedent's "mother, sister, niece, and certain named charities." *Id.* at 351, 22 Ill.Dec. 709, 383 N.E.2d at 189. When the decedent died, her husband filed suit to invalidate the *inter vivos* trust as to him because the decedent retained absolute control over it during her lifetime. *Id.* The court dismissed the notion that a decedent's retained control of an asset has any overarching significance in this context and concluded:

> The declaration of trust immediately created an equitable interest in the beneficiaries, although the enjoyment of the interest was postponed until [the decedent's] death and subject to her power of revocation. This, however, did not make the transfer illusory. And the power of control that she had as trustee was not an irresponsible power; she was charged with a fiduciary duty in respect to the beneficiaries' interest, and her management and administration of the assets in trust could only be exercised in accordance with the terms of the trust.

*Id.* at 364, 22 Ill Dec. 709, 383 N.E.2d at 195; *see also Farkas v. Williams*, 5 Ill.2d 417, 430, 125 N.E.2d 600, 607 (1955) (noting that "the undeviating trend in cases dealing with the validity of trust declarations is to treat reservations ... as conditions subsequent which may operate to defeat the interest of the beneficiaries, but which, unexercised, do not prevent the vesting of equitable title" (internal quotations omitted)).

Based on the facts underlying the trust's creation and the decedent's maintenance of the trust during the seven months preceding her death, the *Johnson* court held that the trust did not circumvent improperly the surviving husband's statutory right to an elective share of the decedent's estate. *Id.* at 364–65, 22 Ill.Dec. 709, 383 N.E.2d at 195. Specifically, the court relied on the facts that the decedent knew that her husband was independently wealthy, that the decedent's mother was

financially dependent on the decedent, that the trust terms provided for the successor trustee to take over if the decedent could no longer serve as trustee, and that the decedent did not exercise any of her retained powers or otherwise deplete the trust's assets. *Id.* According to the court, "[t]hese facts tend to show that she intended to make a valid and effective transfer at the time her declaration of trust was executed." *Id.* at 365, 22 Ill.Dec. 709, 383 N.E.2d at 195.

■ In the present case, Gilles retained the power to revoke the Trust at anytime "by notice in writing." He named himself as trustee and retained a life-estate in the net income of the Trust. Gilles also retained the power to invade the principal of the Trust. With respect to the TOD accounts, Gilles retained the power to change the beneficiary of those accounts.[23] It is clear that Gilles retained absolute control over the Trust; however, this Court has not made that characteristic the sole touchstone of an *inter vivos* transfer that will be invalidated as to a surviving spouse. While retained control is a significant fact to consider, it is not, by itself, a sufficient justification for invalidating an *inter vivos* trust. Accordingly, we reverse the judgment of the intermedi-

---

**23.** For this reason, we think it helpful to view the TOD accounts like trust accounts for present analytical purposes. As a practical matter, a TOD account is similar to a trust account in that the beneficiary cannot draw from it during the donor's lifetime. We note, however, that Gilles's retained power to change the name of the beneficiary is, by no stretch of the imagination, tantamount to absolute control; it is not even the type of control with which a court scrutinizing such an account should be concerned with in this context. *See Bullen v. Safe Deposit & Trust Co.*, 177 Md. 271, 279, 9 A.2d 581, 585 (1939) (noting that the decedent's power to name the beneficiary of his life insurance policy did not give his surviving wife an interest in the policy because his death benefits were not, and had never been, owned by him). It is the decedent's power to make use of the asset during her or his lifetime that matters. *Id.* While it is clear that Gilles retained absolute control over the Trust, it is not clear whether his access to the funds in the TOD accounts was limited in any way. If Gilles had absolute control with respect to accessing the funds in the TOD accounts, as we have stated, it would not be fatal to their validity as to Kathleen; however, as we will explain in Section II, *infra*, if it bears out on remand that Gilles's access to the funds in the TOD accounts was limited in any way, the trial court may consider that fact as further evidence of their validity.

ate appellate court and direct a remand of this case to the trial court for further proceedings not inconsistent with this opinion.

## II.

■ Although we conclude that Gilles's retention of control over the Trust and TOD accounts does not mean necessarily that they are invalid as to Kathleen, we still must consider whether the trial court was clearly erroneous in finding against Kathleen. According to Maryland Rule 8–131(c):

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

"The deference shown to the trial court's factual findings under the clearly erroneous standard does not, of course, apply to legal conclusions." *Griffin v. Bierman*, 403 Md. 186, 195, 941 A.2d 475, 480 (2008) (quoting *Nesbit v. Gov't Employees Ins. Co.*, 382 Md. 65, 72, 854 A.2d 879, 883 (2004)).

Because we cannot be certain from the trial judge's explication that he applied properly the law in this case as declared in this opinion, we are not in a position to determine whether the trial court's factual findings were clearly erroneous. At the conclusion of the evidence, the trial court found that Gilles had no intention to defraud Kathleen and, therefore, there was no actual or constructive fraud. Intent to defraud, however, is not the appropriate bellwether. For the guidance of the trial court on remand, we shall iterate the applicable principles for determining whether a decedent's *inter vivos* transfer should be set aside as an unlawful frustration of a surviving spouse's statutory right to a share of the decedent's estate.

In a 1949 Maryland Law Review article, Melvin J. Sykes, Esquire, ably described the problem that we perceive with the trial court's explication of its extant decision in this case:

The problem presented by these cases calls for the discriminating exercise of judicial discretion. While discretion necessarily involves uncertainties, which are perhaps even desirable where considerations of policy are delicately balanced, the confusion in the cases seems unnecessarily increased by a hazy delineation of the precise problem to be solved, by the tendency of the cases to try to fit facts into one precedent or another without fundamental analysis of the *ratio decidendi,* by the use of question-begging formulas such as "fraud," and by the citation of cases inconsistent with the proposition for which they are cited. As the law now stands, therefore, the lawyer seeking some measure of practical guidance from the cases is confronted with confusion worse confounded than should be necessary.

Sykes, Inter Vivos *Transfers in Violation of the Rights of Surviving Spouses, supra,* at 19. This is the problem that we hope to see remedied on remand.

We begin by examining the connection between a surviving spouse's right to a statutory share of the estate and a court's power to invalidate a decedent's *inter vivos* transfer that frustrates that right. Historically, surviving spouses were protected by the estates of dower and curtesy. Angela M. Vallario, *Spousal Election: Suggested Equitable Reform for the Division of Property at Death,* 52 CATH. U.L.REV. 519, 526 (2003). Dower was the right of a surviving wife to a life estate in one-third of her deceased husband's real property, which he could not devise by will or transfer during his lifetime without her consent; curtesy was the somewhat reciprocal right of a surviving husband to a life estate in his deceased wife's real property, provided there were children born of the marriage. *Lefteris v. Poole,* 234 Md. 34, 38, 198 A.2d 250, 252 (1964); *Fitzpatrick v. Mercantile–Safe Deposit & Trust Co.,* 220 Md. 534, 554, 155 A.2d 702, 712 (1959); *Jaworski,* 149 Md. at 117–18, 131 A. at 43; Vallario, *Spousal Election, supra,* at 528–30.[24]

---

24. The estates of dower and curtesy were abolished in 1970. *Grove v. Frame,* 285 Md. 691, 697, 402 A.2d 892, 896 (1979); *see also* Maryland Code (1974, 2001 Repl.Vol.), Estates and Trusts Article, § 3–202.

As it was perceived that the nature of wealth began to shift from real to personal property, dower as a protection for widows became increasingly obsolete because husbands remained free to devise their personal property as they chose. Sykes, Inter Vivos *Transfers in Violation of the Rights of Surviving Spouses, supra,* at 2. Thus, beginning in the early nineteenth century, states responded by passing elective share statutes to protect widows from being disinherited and left with no reasonable means of financial support. *Id.*

As this Court observed on a prior occasion, Maryland enacted its original elective share statute in 1798. *Domain v. Bosley,* 242 Md. 1, 7–8, 217 A.2d 555, 559 (1966). That statute, the forerunner to Section 3–203, provided, in pertinent part, that a widow who renounces her right to take under her husband's will "shall be entitled to one third part of the personal estate . . ., which shall remain after payments of his just debts, and claims against him, and no more." *Id.* (quoting Ch. 101, subch. 13, of the Acts of 1798).[25] We have noted that

---

**25.** In Maryland, a surviving spouse's right to an elective share is derived from a common law right that the first colonists enjoyed under English law. *See Domain,* 242 Md. at 7, 217 A.2d at 559; *Griffith v. Griffith's Executors,* 4 H. & McH. 101 (Gen. Ct. May Term 1798). In *Griffith,* Judge Pinkney surveyed the history of a widow's right to elect against the will of her deceased husband. 4 H. & McH. at 118–21. At early common law, a widow had two important rights that protected her from being disinherited: a dower right to one-third of her husband's legal interests in real estate, which he could not devise by will or transfer during his lifetime without her consent; and a right to one-third of her husband's personal estate. *Id.* The latter right could not be devised away from her. *Id.* If the husband devised his personal property, the widow could recover her share of it "in opposition to her husband's testament." *Id.* at 121. Judge Pinkney noted that in England, at the time he was writing, a widow had only a dower right with no protection against being disinherited of her husband's personal property; however, he elaborated that this change occurred judicially, "imperceptibly and silently," and after the time of Maryland's colonization. *Id.* at 118–21. Thus, he concluded that the law of Maryland was the earlier rule, which provided a widow with both the right to dower and the right to one-third of her deceased husband's personal estate if she chose to elect against his will. *Id.* at 120; *see also* Sykes, Inter Vivos *Transfers in Violation of the Rights of a Surviving Spouse, supra,* at 1–2 (noting that, in twelfth-century England, the widow's right to one-third of her deceased husband's personal estate was enforced by

"the public policy which surrounds the marriage relationship ... underlies the elective share statute." *Shimp,* 315 Md. at 645, 556 A.2d at 263; *see also* Vallario, *Spousal Election, supra,* at 530 (commenting that traditional elective share statutes "reflect a duty of support that arose at the time of the marriage").

Thus, one of the important attributes of dower was that a husband could not transfer the legal title to his real property during his lifetime, unless his wife consented. *See Grove v. Frame,* 285 Md. 691, 697, 402 A.2d 892, 896 (1979) (noting that "transfer of legal title to real property, without the wife's consent, did not destroy her right of dower upon her husband's death"). This rule did not apply to personal property, effectively leaving a husband free to disinherit his wife by disposing of all (or substantially all) of his personal property through *inter vivos* transfers. *See Rabbitt v. Gaither,* 67 Md. 94, 104–05, 8 A. 744, 748–49 (1887) (noting that a husband's power during his lifetime freely to dispose of his personal property "has been so long recognized by the courts, and so often exercised, as to have become, not only a well-established principle of law, but a settled rule of property"). To protect the surviving spouse's right to a statutory share from being effectively stripped by *inter vivos* transfers, a doctrine evolved whereby Maryland courts of equity could invalidate a sham transaction in which a decedent unlawfully frustrates that right by parting with ownership in form only. *E.g., Collins v. Collins,* 98 Md. 473, 483–84, 57 A. 597, 600–01 (1904); *Sanborn v. Lang,* 41 Md. 107, 118 (1874); *Hays,* 1 Md. Chan. at 341–42. Indeed, although we previously referred to this judicial authority as the doctrine of fraud on marital rights, on more than one occasion, we have stated more aptly its purpose: "to

the writ *de rationabili parte bonorum,* but that the writ "gradually fell into disuse and was completely abolished in 1837").

In *Domain,* this Court noted that Maryland's 1798 elective share statute "resulted from" and "was in complete conformity with the holding in *Griffith." Domain,* 242 Md. at 7–8, 217 A.2d at 559 (chronicling the changes from 1798 to 1957 to Maryland's elective share statutes for both real and personal property).

balance the social and practical undesirability of restricting the free alienation of personal property against the desire to protect the legal share of the spouse." *Knell,* 318 Md. at 512, 569 A.2d at 641; *Winters,* 254 Md. at 583, 255 A.2d at 26; *Whittington,* 205 Md. at 11, 106 A.2d at 77; *Allender,* 199 Md. at 550, 87 A.2d at 611.

Two early cases from the High Court of Chancery continue to provide the guideposts for a court's exercise of this equitable power in Maryland, *Hays v. Henry,* 1 Md. Chan. 337 (1851), and *Dunnock v. Dunnock,* 3 Md. Chan. 140 (1853). In *Hays,* the decedent was estranged from his wife and used his money to buy land for a woman with whom he had fathered two children and cohabitated for the 20 years preceding his death. 1 Md. Chan. at 337–40. She then conveyed the property to the decedent to hold in trust for her and their children. *Id.* at 339–40.[26] The decedent lived on the property for the rest of his life. *Id.* at 340. When he died, his wife argued that the two-part transaction was a sham designed for him to be the property's true owner. *Id.* at 338. The chancellor stated:

> [A]lthough the husband is not permitted to deprive his wife of her reasonable share of his personal estate by will, there can be no doubt of his power to dispose absolutely of this description of property during his life, independently of the concurrence, and exonerated from any claim of the wife, provided the transaction is not merely colorable, and unattended with circumstances indicative of fraud on the rights of the wife. If the disposition by the husband be *bona fide,* and no right is reserved to him, then, though made to defeat

---

**26.** The court characterized the decedent's interest in the property in the following manner:

> There is, moreover, in the assignment of the lease by Charlotte Henry to Hays, a provision which seems to have been designed to secure him in the possession of the property during his life. The language of the covenant is, "that he shall peaceably and quietly have, hold, use, occupy, possess and enjoy, the said piece of ground and premises," & c., "without the let, suit, molestation, interruption, eviction or disturbance of the said Charlotte Henry," & c.

*Id.* at 340.

the claim of the wife, it will be good against her, because ... an act cannot be denounced as fraudulent which the law authorizes to be done.

But if it be a mere device or contrivance, by which the husband, not parting with the absolute dominion over the property, seeks, at his death, to deny his widow that share of his personal estate which the law assigns her, then it will be ineffectual against her.

One of the badges of fraud in such cases, is the retention of the possession of the property by the husband, after the transfer of the title, or keeping the deed in his hands after its execution.

*Id.* at 338–39 (italics in original). The chancellor agreed with the wife and concluded that the conveyances "were the result of a contrivance, invented ... to deprive the complainant of that portion of the personal estate of her husband. . . ." *Id.* at 341. Importantly, the chancellor reached his opinion "[i]n view of all the circumstances in this case." *Id.*

In *Dunnock*, the High Court of Chancery focused on the significant distinction between an ostensible transfer with retained possession of the property and an actual transfer with a retained right to retake possession, recognizing that the latter ordinarily will not be invalidated. 3 Md. Chan. at 146–47. Unlike *Hays*, *Dunnock* did not involve a surviving spouse attempting to take a share of her deceased husband's estate at his death; rather, the wife in *Dunnock* had been abandoned by her husband and left with no means of financial support. *Id.* at 144. She sought to invalidate her husband's conveyance of slaves [27] to his brother [28] on the ground that the husband

---

**27.** That the law, for a significant time, regarded people as personal property because of their race is, of course, abhorrent by modern standards. Sadly, slavery is a part of Maryland's history and, as shown by *Dunnock*, made its way into our legal fabric. Thus, we are compelled to consider *Dunnock* as part of the body of cases that addresses the topic under consideration in the present case.

**28.** Although it is not explicitly clear, the court's opinion indicates that the transfer was between brothers because they were both named

retained the power to demand their return if he ever needed them again. *Id.* at 146. By the terms of the conveyance, the brother was to forfeit $1,200 if he did not comply with the demand. *Id.* Applying the "mere device or contrivance" standard from *Hays,* the chancellor held that the husband's conveyance to his brother was not invalid as to his wife because, after the conveyance, the husband left the country with no intention of returning. *Id.* at 147–48. The chancellor considered this to be strong evidence that the husband did not intend ever to demand return of the slaves. *Id.* Moreover, the husband was now bound by the terms of his arrangement with his brother, who was bound only to return the slaves on demand or forfeit $1,2000. *Id.* at 147. Accordingly, the chancellor concluded that the husband's reservation of the right to demand return of his property, in this case, was not "the kind of reservation ... which would defeat his unquestionable right to give away his personal property, to the prejudice of [his wife's] claim to a distributive share after his death." *Id.*

 Put simply, *Hays* and *Dunnock* stand for the proposition that the question to be determined in any case in which a surviving spouse seeks to invalidate an *inter vivos* transfer is whether the transfer was set up as a mere device or contrivance. If it was, the surviving spouse may have it set aside. This standard places the focus of a court's inquiry on the nature of the underlying transaction, not on the decedent's intent to defraud the surviving spouse. Determining whether an *inter vivos* transfer was a mere device or contrivance is indeed a question of intent; however, the intent that matters is the decedent's intent to structure a transaction by which she or he parts with ownership of the property in form, but not in substance. *See Allender,* 199 Md. at 549, 87 A.2d at 608 (noting that "[t]he principle here invoked goes beyond the formal completeness of the transfer"); *see also Mushaw,* 183 Md. at 517, 39 A.2d at 468; *Sturgis,* 152 Md. at 660, 137 A. at

Dunnock and the husband had indicated that he wanted his brother's family to have his slaves. *Dunnock,* 3 Md. Chan. at 147.

381. As we shall explain, except to the extent that it sheds light on whether a transfer was a mere device or contrivance, a decedent's intent to defraud her or his surviving spouse is not the proper focus of the analysis of the issue. While left mostly unspoken, this Court consistently has looked to the nature of the assailed *inter vivos* transfer, regardless of the words that were used to give a name to the doctrine under which we exercised judicial authority.

In *Brown, supra,* we focused on the trust form used by the decedent in upholding a revocable *inter vivos* trust that she established and controlled during her lifetime. 126 Md. at 184, 94 A. at 526. In doing so, we said that "[t]he deed from the grantor to the trust company was a complete and bona fide transfer of the property to the trustee, for the purposes named therein." *Id.* Instead of using the mere device or contrivance language, we expressed the same standard in the affirmative by asking whether the transfer was complete and bona fide.

In *Sturgis v. Citizens' Nat'l Bank of Pocomoke City,* we upheld the validity of a trust account that the decedent established for his nieces and controlled during his lifetime. 152 Md. at 656–57, 137 A. at 379–80. Like the deed of trust at issue in *Brown,* the decedent's reservation of rights in the trust account did not prevent necessarily the *inter vivos* trust declaration from being complete. To be sure, we noted:

> The trust provision made use of in these deposits, as an alternative to delivery of the subject-matter of the gift . . ., is nothing more than a declaration that despite the retention of control by one of the beneficiaries, it is in the interest of both that the property is held.

*Id.* at 658, 137 A. at 380 (internal citation omitted). We said that the decedent's reservation of rights in the trust account should be viewed "in connection with other facts to determine whether there has been a fraudulent use" of the trust form. *Id.* at 660, 137 A. at 381. In *Sturgis,* the decedent created a trust account in which he and his nieces were "joint owners" and the balance of the account would be paid to his nieces at

his death. *Id.* at 656–57, 137 A. at 379–80. The decedent chose this arrangement after learning that he could not leave a check for them payable on his death. *Id.* at 656, 137 A. at 379. Although the nieces could have drawn money out at any time, the bank never obtained signature cards from them. *Id.* at 657, 137 A. at 380. Importantly, the decedent never made any withdrawals from the account after his initial deposit in trust. *Id.* In his will, the decedent left to his surviving wife one third of his personal and real estate; however, it is not clear what the difference was between what she received under the will and what the nieces received by the trust account. *Id.* at 656, 137 A. at 379. On these facts, we concluded that the trust account was "not a mere fiction" and was "consistent with a fully completed gift." *Id.* at 660, 137 A. at 381 (quoting Dunnock, supra, 3 Md. Chan. at 147). "[I]t was clearly [the decedent's] desire and intention to make a legally effective gift to the grandnieces on this form. . . ." *Id.* at 660, 137 A. 378.

Although we invalidated trust accounts in *Mushaw, supra,* as already discussed, we did so because of the degree to which they stripped the surviving spouse of property that otherwise would have been part of the decedent's estate. 183 Md. at 517, 39 A.2d at 467. There, the decedent created a trust account for each of his four sons from a prior marriage, depositing $9,103.08 in each of the accounts. *Id.* at 512, 39 A.2d at 465. At the time of his death, the decedent's net estate consisted of $90 in his solely-owned account, a $100 government bond, and "the house and lot ... where he resided." *Id.* at 514–15, 39 A.2d at 466. The decedent executed his will before he married his surviving wife, and it did not mention her. *Id.* at 514, 39 A.2d at 466. As a trustee and beneficiary of the accounts with the sole right to make withdrawals, the decedent retained complete control over the accounts during his lifetime. *See id.* at 519, 39 A.2d at 468–69. We said that such power "does not affect the legal validity of the form of gift, [but] it is a significant fact to be considered in passing upon the good faith of the husband in relation to the marital rights of the wife." *Id.* at 519, 39 A.2d at 468. In

other words, the ultimate goal of our inquiry in *Mushaw* was to determine whether the decedent's use of the trust form was in good faith. We agreed that the trust accounts reflected complete transfers in the formal sense; however, we resolved that the extent to which they stripped the surviving spouse of the decedent's property cut against their substantive completeness and, combined with the decedent's retained right of lifetime control, indicated a bad faith use of the trust form. *Id.* at 519, 39 A.2d at 468–69. Our reference to "fraud" with respect to the decedent's use of the trust form meant that the *inter vivos* transfers were in bad faith. *See id.; see also Windsor,* 475 F.2d at 933 (stating that courts in Maryland ordinarily will not invalidate a transfer as to a surviving spouse if the transfer was "made in good faith").

In *Gianakos, supra,* we rhetorically asked whether the underlying transaction was a "sham" and determined that the decedent set it up the way that he did because he "had a sound business reason" for doing so. 234 Md. at 31, 197 A.2d at 906. Accordingly, it was not invalid as to the decedent's surviving wife. *Id.* at 33, 197 A.2d at 907. The decedent in *Gianakos* transferred restaurant property to his son, who was also his business partner, and retained a life estate with power to "lease, mortgage, deed or in any other wise encumber the property absolutely." *Id.* at 30, 197 A.2d at 905–06. The trial court found that it was in the decedent's "interest to retain control over [his son] in the business and over the real estate used therein by reserving to himself a life estate, with certain powers during his life." *Id.* at 30, 197 A.2d at 905–06. Specifically, the trial court stated that "[the decedent's son] was necessary to [the decedent] to assure the continued running of the business, whether he remained single in his declining years or married . . . ." *Id.* at 31, 197 A.2d at 906 (quoting trial court).[29] We considered also the degree to

---

**29.** In *Gianakos* the decedent transferred real property before he married. 234 Md. at 28–29, 197 A.2d at 904. Thus, dower rights did not attach to it. The decedent was merely "contemplating the possibility of remarriage . . . and had not even decided who he wanted to marry" when he made the assailed property transfer to his son. *Id.* Nonethe-

which the decedent's *inter vivos* deed to his son diminished the surviving wife's share of the decedent's estate, but concluded that it did not reflect that the deed was a sham. *Id.* at 32–33, 197 A.2d at 907.

Although we have looked at the effect that an *inter vivos* transfer has on the estate available to the surviving spouse, a decedent's intent to defraud a surviving spouse of property is not a court's direct concern. *E.g., id.* at 31–33, 197 A.2d at 906–07; *Mushaw,* 183 Md. at 519, 39 A.2d at 468–69. Indeed, we said in *Sturgis* that "[the decedent] must have contemplated that the trust account might reduce the total fund in which his wife would share at his death, for that would be the obvious consequence of any gift. . . ." 152 Md. at 661, 137 A. at 381. And, in *Gianakos,* we noted that "[e]very transfer of property by gift by a married man or by a man about to marry, of course, reduces the amount of property in which his prospective widow may share by intestacy or renunciation (or for that matter by devise or legacy from him). . . ." 234 Md. at 31, 197 A.2d at 906. We are persuaded also by the reasoning of the D.C. Circuit Court of Appeals that "[o]bviously, any transfer of property will decrease the statutory share of the spouse, but courts in Maryland and elsewhere have been hesitant to set aside such transfers if they were made in good faith." *Windsor,* 475 F.2d at 933. Accordingly, we now agree somewhat with Mr. Sykes that "[i]t would be helpful if instead of speaking of 'fraud', the courts would speak of 'violation of marital rights'. . . ." Sykes, Inter Vivos *Transfers in Violation of the Rights of Surviving Spouses, supra,* at 11.[30]

---

less, we assumed, without deciding, that the surviving wife's right to invalidate the decedent's *inter vivos* transfer could be extended to the pre-marriage transfers in that case. *Id.* at 29, 197 A.2d at 905.

**30.** We will not speculate as to why the doctrine incorporated the word "fraud." In his Maryland Law Review article, Mr. Sykes pointed out that *Hays* used the term of art "badge of fraud." Sykes, Inter Vivos *Transfers in Violation of the Rights of Surviving Spouses, supra,* at 6 n. 27. He stated:

Under the obsolete doctrine of Twyne's Case, Star Chamber 1601, 3 Coke 80B, when a "badge" of fraud is proved, the fraud is proved.

To summarize, when a surviving spouse seeks to invalidate the non-probate disposition of an asset, a scrutinizing court must focus on the nature of the underlying *inter vivos* transfer. If it was "complete and bona fide" or done in "good faith" (both phrases meaning the same thing in this context), the court must respect the estate planning arrangements of the decedent and may not invalidate the transaction; however if it was "a mere device or contrivance," "a mere fiction," "a sham," or "colorable" (each also sharing the same meaning in this context), the court shall invalidate the underlying transaction as to the surviving spouse. *E.g., Knell,* 318 Md. at 510, 569 A.2d at 640 ("mere device or contrivance" and "colorable"); *Mushaw,* 183 Md. at 519, 39 A.2d at 468 ("good faith"); *Sturgis,* 152 Md. at 660, 137 A. at 380 ("mere fiction"); *Brown,* 126 Md. at 184, 94 A. at 526 ("complete and bona fide"); *Dunnock,* 3 Md. Chan. at 147 ("mere device or contrivance" and "mere fiction"); *Hays,* 1 Md. Chan. at 339 ("mere device or contrivance" and "colorable"). In order to answer this question, a court must consider whether the decedent truly intended that the *inter vivos* transfer divest her or him of ownership in form, but not in substance. Stated in more practical language, the question for a court to decide is whether the decedent intended that the transfer change nothing, except how the property is directed at the decedent's death. Notwithstanding our previous references to "fraud" on marital rights, because we ultimately are not concerned with whether a decedent intended to deprive her or his surviving spouse of property, we emphasize today that it is more helpful for a court to think of a sham transfer in this context as an

---

Thus fraud could be reduced to objective rules. It is curious that after a course of reasoning which proves that fraud is not the test, the court adheres to fiction and states its conclusion in terms of fraud. *Id.* Whether the word fraud came into use in this context by happenstance and repetition is not important. As early as *Dunnock,* it was clear that fraud does not have its usual meaning here, and by the time we decided *Whittington,* it was well-established that the focus of a court's inquiry should be on the substantive completeness of the transfer under attack. *See Allender,* 199 Md. at 549, 87 A.2d at 608; *Mushaw,* 183 Md. at 517, 39 A.2d at 468; *Sturgis,* 152 Md. at 660, 137 A. at 381; *Brown,* 126 Md. at 184, 94 A. at 526.

unlawful frustration of the surviving spouse's statutory share. *See White*, 875 A.2d at 666 (stating that "fraud in the classic sense" is not at issue and that a court should instead look for an "improper circumvention of the marital rights of the surviving spouse"); Sykes, Inter Vivos *Transfers in Violation of the Rights of Surviving Spouses, supra*, at 11 (suggesting that "instead of speaking of 'fraud', the courts would speak of 'violation of marital rights' ").[31]

As we have explained, a decedent's retained control over transferred property during her or his lifetime does not mean, in and of itself, that the transfer was a mere device or contrivance or was not complete and bona fide; a court scrutinizing an *inter vivos* transfer, as it relates to the statutory share of a surviving spouse, "must call to [its] aid every fact, however remote and trivial it may be, which can throw light upon the subject." *Feigley*, 7 Md. at 562. We admit that determining whether someone intended that an *inter vivos* transfer be a sham that changes nothing may be difficult, as it is an ethereal touchstone. There also is the complicating fact that the person whose intent matters most is deceased when the judicial inquiry typically engages itself. We believe, however, that three considerations lessen somewhat the difficulty of this analysis.

First, as a threshold matter, a surviving spouse must show that the decedent retained an interest in or otherwise continued to enjoy the transferred property. In *Mu-*

---

**31.** The *Johnson* opinion by the Supreme Court of Illinois summarizes concisely this point:

> Since "intent to defraud" in the context of these cases does not carry the traditional meaning of fraud, and since a property owner may convey his property for the precise purpose of defeating his spouse's marital rights, the meaning of "intent to defraud" must be construed in connection with the words "illusory" and "colorable" with which it is usually associated in the cases cited. It has been suggested that the intent by which a transfer is to be tested should not be stated in the confusing terms of "intent to defraud," but it should be tested by the intent of the donor to retain or to part with the ownership of property.

73 Ill.2d at 359, 22 Ill.Dec. 709, 383 N.E.2d at 192–93.

*shaw*, we said that "where [a decedent] does not part with dominion over the property transferred, the issue of good faith is immediately raised." 183 Md. at 519, 39 A.2d at 468. Nonetheless, this Court has held that an *inter vivos* transfer in which a decedent gives up all control of the transferred property may not be invalidated by a surviving spouse as an unlawful frustration of the spouse's statutory share. *Grove*, 285 Md. at 698, 402 A.2d at 896. This is so even if the decedent's express desire in alienating her or his property was too deprive the surviving spouse of the property. *Id.* at 696, 402 A.2d at 895–96 (quoting *Rabbitt*, 67 Md. at 104–05, 8 A. at 748–49); *see also Winters*, 254 Md. at 582, 255 A.2d at 25 (citing *Kernan v. Carter*, 132 Md. 577, 583, 104 A. 530, 532 (1918)). The law favors the free alienation of property and, thus, "an act cannot be denounced . . . which the law authorizes to be done." *Hays*, 1 Md. Chan. at 338; *see also Grove*, 285 Md. at 696, 402 A.2d at 895–96. Thus, a transfer, whereby the decedent retained no interest or enjoyment at all in the transferred property, is, by its nature, not subject to later successful attack by the decedent's surviving spouse. *See Grove*, 285 Md. at 698, 402 A.2d at 896. In other words, "[i]f willing to cut off his nose, the donor is allowed to spite his face." Sykes, Inter Vivos *Transfers in Violation of the Rights of Surviving Spouses, supra*, at 12.

Second, as a guiding principle, courts should not employ their equity powers to second-guess reasonable and legitimate estate planning arrangements. *Cf. Winters*, 254 Md. at 585, 255 A.2d at 27 (noting that decedent's decision to provide for his grandchildren and great-grandchildren was "not only understandable but legitimate"); *Whitehill v. Thiess*, 161 Md. 657, 661, 158 A. 347, 348 (1932) (noting that, under the circumstances, decedent's decision to leave everything to her children despite her surviving husband was "reasonable and just"); *Brown*, 126 Md. at 180, 94 A. at 524 (stressing the "reasonable character" of the decedent's trust). For this reason, we think that a surviving spouse has a high hurdle to overcome.

 Third, our case-law offers considerable guidance with respect to what factors are relevant to determining, in this context, whether a decedent intended that an *inter vivos* transfer be a sham. For the guidance of the trial court (and posterity), we will chronicle and elucidate those factors that we consider most relevant, beginning with the factors that we approved expressly in *Whittington.*[32]

The extent of the control retained by the decedent probably is the most useful indicator when scrutinizing an *inter vivos* transfer. As we explained, other considerations must exist concurrently with retained control for a surviving spouse to invalidate the transfer; however, our case-law suggests that retained control is a very important factor because, in every case in which we have invalidated an *inter vivos* transfer, the decedent retained a significant amount of control. *See generally Knell,* 318 Md. at 512, 569 A.2d at 641–42 (decedent retained sole power to dispose of real property including remainder); *Mushaw,* 183 Md. at 519, 39 A.2d at 468–69 (decedent retained sole power to withdraw funds from trust accounts); *Jaworski,* 149 Md. at 120, 131 A. at 44 (decedent retained sole right to convey leasehold interest). Indeed, even in those cases where we refused to invalidate the *inter vivos* transfer at issue, the decedents generally retained absolute or near absolute control over their property, requiring the litigants to square-off over the presence *vel non* of other factors. *See generally Winters,* 254 Md. at 584, 255 A.2d at 26 (dece-

---

**32.** *Whittington* speaks of "tests." 205 Md. at 12, 106 A.2d at 77. We think that they should be viewed more properly as factors because each of the so-called "tests" is simply an indicator of whether the underlying transaction was a mere device or contrivance, which, as we have explained, is a court's ultimate concern. Indeed, we applied them as factors in *Whittington,* 205 Md. at 14, 106 A.2d at 78, *Gianakos,* 234 Md. at 29–33, 197 A.2d at 905–07, and *Winters,* 254 Md. at 584–85, 255 A.2d at 26–27. Likewise, the D.C. courts have treated them like factors as well. *See Windsor,* 475 F.2d at 934; *White,* 875 A.2d at 665; *see also* Sykes, Inter Vivos *Transfers in Violation of the Rights of Surviving Spouses, supra* at 11 ("To debate the merits of an ultimate legal test of the validity of *inter vivos* transfers is to obscure the practical problem of what considerations actually influence courts in reaching their decision.").

dent retained sole power to withdraw funds from most accounts); *Gianakos,* 234 Md. at 31–33, 197 A.2d at 906–07 (decedent retained sole power to lease, mortgage, or encumber real property); *Whittington,* 205 Md. at 14, 106 A.2d at 78 (decedent kept passbooks of trust account beneficiaries in his possession). In *Allender v. Allender,* we examined specifically the extent of retained control, concluding that something more was required than what the decedent retained in that case. 199 Md. at 550, 87 A.2d at 612. There, the decedent surrendered stock certificates in his name in exchange for new certificates in the names of him and his sons jointly. *Id.* at 545, 87 A.2d at 609. He never told his sons about the transfer, and he continued to exercise voting rights in the stock and collect dividends. *Id.* at 549–50, 87 A.2d at 611. We held, however, that the decedent's control was not sufficient for his surviving wife to invalidate the stock transaction because the decedent "retained no control over the devolution of the joint interest at his death and no power to revoke or undo what he had done. . . ." *Id.* at 550, 87 A.2d at 612. While there is a wide chasm between the control that the decedent retained in *Allender* and that retained in this case and other cases in this area of the law, *Allender* stands as an outer limit. In the present case, Gilles retained absolute control over the Trust; however, on remand, the trial court should consider the extent to which Gilles could withdraw funds freely from the TOD accounts, especially because the TOD accounts now make up the bulk of the funds in the Trust. Funds in an IRA account may be accessible, but the ease of that accessability (and the tax consequences) is a far cry from that of funds in a checking or savings account.

A decedent's motives are also cogent to consider. *Whittington,* 205 Md. at 12, 106 A.2d at 77. In an early case, *Collins v. Collins,* we invalidated a deceased husband's *inter vivos* transfer of all of his real and personal property, on the eve of his second marriage, to his children from a prior marriage. 98 Md. 473, 474, 57 A. 597, 597 (1904). There, the decedent's motives revealed themselves in the fact that he led his surviving wife to believe that he continued to own the property outright and that she would receive a share of it when he died.

*Id.* at 474–75, 57 A. at 598. Likewise, in *Jaworski,* we were persuaded that the decedent's *inter vivos* transfer was a fiction, in part, because the executor of her estate testified that the decedent told him that "she did not want her husband to have anything, that she 'would not give him a straw,' and that she 'had fixed her property or money so that he would not get anything' . . . ." 149 Md. at 113, 131 A. at 41.

In other cases, however, we have relied on evidence of the decedent's motives as an indicator that the assailed *inter vivos* transfer actually was intended to be complete and bona fide. As we already explained, in *Gianakos,* we considered the trial court's finding that the decedent wanted to retain control over his restaurant property so that he could keep his son, to whom he transferred the remainder, "active in the business." 234 Md. at 31, 197 A.2d at 906. Accordingly, we observed that the decedent "had a sound business reason," which indicated that the transaction was done in good faith. *Id.* at 31–32, 197 A.2d at 906. In *Bestry v. Dorn,* we refused to invalidate a decedent's *inter vivos* deed of a leasehold interest to her daughter from her first marriage. 180 Md. 42, 47, 22 A.2d 552, 554 (1941). There, the decedent herself was widowed by her first husband and left with the leasehold which they owned as tenants by entireties. *Id.* at 43, 22 A.2d at 552. Her first husband paid most of the mortgage indebtedness on the property. *Id.* at 44, 22 A.2d at 553. After the decedent remarried, the daughter of her first marriage and the daughter's husband paid the balance of the mortgage indebtedness. *Id.* In exchange, the decedent deeded to them the leasehold, subject to a retained life estate and a retained power to "mortgage, sell or otherwise dispose of or encumber the property." *Id.* at 44–45, 22 A.2d at 553. We concluded that the facts indicated that the *inter vivos* transfer, despite the decedent's retained right of control, reflected what the decedent regarded as her moral obligation to see that the property go to her daughter from her marriage to her first husband. *Id.* at 47, 22 A.2d at 554.[33]

---

33. In his article, Mr. Sykes suggests that the relative moral claims of the spouse and the beneficiary be considered. Sykes, Inter Vivos

Part and parcel to assessing the motives of the decedent is consideration of the transferee's motives as well. *See Whittington*, 205 Md. at 12, 106 A.2d at 77. This requires that a court consider what were the true terms of the transfer. We could envision a scenario in which the decedent gave her or his property to someone, subject to a mutual understanding that the decedent remain the real owner. Unfortunately, there is a dearth of precedent on this point. *Hays*, however, provides some insight. There, the decedent ostensibly was holding the property in trust for the "sole use" of the mother of his children; however, given that she was a party to the two-part transaction that made him the trustee and that he lived on the property with her during his lifetime, the High Court of Chancery was persuaded that her transfer of the property to him as trustee was "intended to consummate a purpose contemplated when the purchase was made." *Hays*, 1 Md. Chan. at 340.

*Whittington* also provides some insight about how a transferee's actions may bear on the validity of a decedent's *inter vivos* transfer. We noted there the absence of "fraud on the part of the donees shown as to their father [the decedent] or their step-mother." *Whittington*, 205 Md. at 13, 106 A.2d at 78. In other words, a court should consider not only whether there was collusion between the decedent and the beneficiary, but also whether the beneficiary intended to defraud the decedent or the surviving spouse.

In the present case, Kathleen testified that she did not know the details of the Trust or the TOD accounts. The trial court found that Gilles did not intend to defraud Kathleen and that he intended to provide for both her and Lauren. The

---

*Transfers in Violation of the Rights of Surviving Spouses, supra*, at 15. We do not think that this consideration is irrelevant, but only because it may reveal the decedent's motive to make sure that the beneficiary's moral claim to the property is protected. *See Whitehill*, 161 Md. at 661, 158 A. at 348 (upholding decedent's deed of all of her property to her children as "reasonable and just" because they paid for the property in the first instance). In other words, the moral claims of the litigants should be viewed as subsumed in the motive factor.

court based its conclusion, in part, on the fact that Gilles named Kathleen as trustee of the Trust in the event that Maryse could not serve. This finding was not clearly erroneous on the present record, but, as we have explained, it should not have been the end of the trial court's fact-finding. The record is silent whether Lauren participated in setting up the Trust or the TOD accounts.

The degree to which an *inter vivos* transfer deprives a surviving spouse of property that she or he would otherwise take as part of the decedent's estate is also extremely significant. *See Gianakos*, 234 Md. at 30, 197 A.2d at 905 (noting that "[i]n *Whittington* the single most important factor was the degree to which the widow's share was reduced by the transactions under attack" (italics added)). *Mushaw* is illustrative of how this factor should be weighed. There, we noted that the "salient fact" in our determination that the decedent did not create the trust accounts in good faith was "that the widow was completely stripped of her marital rights in the personal property of her husband." 183 Md. at 517, 39 A.2d at 467. On one hand, the decedent's estate in that case consisted of $90 in his solely-owned bank account, a $100 government bond, and "the house and lot ... where he resided;" however, the opinion did not discuss the value of the house and lot. *Id.* at 515, 39 A.2d at 466. Moreover, the decedent's will did not provide for his wife at all. *Id.* at 514, 39 A.2d at 466. On the other hand, the four trust accounts that the wife sought to invalidate each contained more than $9,000. *Id.* at 512, 39 A.2d at 465.

In *Whittington*, the surviving spouse received $1,500 in life insurance proceeds and $2,000 from a joint savings account with the decedent. 205 Md. at 7, 106 A.2d at 75. The decedent died leaving an estate "appraised at approximately $25,000 of which about $13,000 consisted of realty and about $12,000 of personal property." *Id.* at 12, 106 A.2d at 77. His will devised a farm to his nephew, on the condition that the nephew pay $1,000 annually to the decedent's surviving wife. *Id.* at 8, 106 A.2d at 75. The decedent made no other provisions for his widow. *Id.* She renounced the will and

sought to invalidate the trust accounts that the decedent established for his sons from a prior marriage. *Id.* We refused to do so, in part, because what she received by renouncing the will was only 40% less than what she would have received if the trust accounts were included in the estate. *Id.* at 13–14, 106 A.2d at 77–78. Similarly, in *Gianakos*, we said that, in light of the circumstances, a 40% reduction was "not unreasonable." 234 Md. at 32–33, 197 A.2d at 907.

Looking at the degree to which an assailed *inter vivos* transfer depleted the value of property available to a surviving spouse necessarily requires a court to consider also non-probate arrangements that the decedent made for the surviving spouse. Kathleen is correct in the present case that life insurance proceeds were not considered expressly in *Whittington;* however, as a general rule, we have considered life insurance and other arrangements made for a surviving spouse. *See Klosiewski v. Slovan Bldg. & Loan Assoc.*, 247 Md. 82, 87, 230 A.2d 285, 288 (1967) (considering life insurance proceeds and house that surviving wife owned with decedent as tenants by the entireties); *Bullen v. Safe Deposit & Trust Co. of Baltimore*, 177 Md. 271, 280, 9 A.2d 581, 585 (1939) (considering life insurance and estate property); *Brown*, 126 Md. at 179–80, 94 A. at 524 (considering life-estate that decedent left for surviving husband by way of trust). A scrutinizing court also should consider as part of this factor *inter vivos* gifts that the decedent gave to the surviving spouse. *See Bullen*, 177 Md. at 280, 9 A.2d at 585 (noting that "[w]hen they married [the widow] was possessed of [a] comparatively small amount of property"). While not the end of the inquiry, if a decedent leaves behind reasonable provisions for her or his surviving spouse, by either probate or non-probate arrangements, *inter vivos* gifts, or a combination thereof, it may suggest that the *inter vivos* transfer that the surviving spouse seeks to have set aside was complete and bona fide and should not be set aside. *See Gianakos*, 234 Md. at 32–33, 197 A.2d at 907 (noting that what wife received was "not unreasonable"); *Brown*, 126 Md. at 179–80, 94 A. at 524

(stressing the "reasonable character of the provisions" of the trust).

For example, Gilles named Kathleen the beneficiary of his Zurich Kemper life insurance policy, and, upon his death, she received $200,000 pursuant to that policy. Under Gilles's will, Kathleen received his Toyota Highlander, which was valued at approximately $22,000. Kathleen also received more than $12,000 as a death benefit from a thrift savings plan, and, before Gilles died, he paid the $17,000 balance outstanding on Kathleen's car loan. Furthermore, during the course of their marriage, Gilles paid Kathleen $1,200 per month toward housing expenses. While it appears that Lauren faired better, Kathleen certainly was not left destitute by Gilles. The trial court must determine on remand how to weigh these facts.[34]

Another factor that commands weight is whether the decedent actually exercised the retained control or otherwise enjoyed the property at issue, and, if so, to what extent. Simply put, use of the property suggests that the decedent did not intend really to part with ownership; conversely, failure to exercise retained powers may suggest that the decedent intended to alienate the property. The High Court of Chancery emphasized this point in *Dunnock* by finding importance in the fact that the husband did not intend to exercise his right to ask for his property back. 3 Md. Chan. at 147–48. Although we have not articulated expressly this factor heretofore, it is a presence revealed in several of our relevant opinions. In *Knell*, for example, the decedent continued to live on the property at issue for 10 years after he created a remainder interest in the property for his live-in companion. 318 Md. at 503, 569 A.2d 636. In *Hays*, the decedent likewise

---

**34.** In his article, Mr. Sykes suggests that the independent wealth of the surviving spouse be considered. *See* Sykes, Inter Vivos *Transfers in Violation of the Rights of Surviving Spouses, supra,* at 15 (referring to whether the surviving spouse has "separate funds"). We agree that this consideration may be relevant, but it is less of an indicator than are funds or assets left to the surviving spouse by the decedent because of a court's concern with the decedent's intent.

continued living on the property despite the fact that, on paper, he merely held it in trust for the "sole use" of his live-in companion. 1 Md. Chan. at 340. In *Sanborn v. Lang*, we invalidated the decedent's *inter vivos* deed of property to his nephew, in part, because, not only did the decedent continue to live on the conveyed property, he also exercised his retained power to mortgage the property and secured a $1000 loan for his own use. 41 Md. at 118. Conversely, in *Whittington*, the decedent made no withdrawals from the trust accounts that he established for his sons, even though he retained the power to do so. 205 Md. at 6, 106 A.2d at 75. Similarly, the decedent in *Sturgis* did not withdraw funds from the trust account that he created for his nieces. 152 Md. at 657, 137 A. at 380. It was also significant to the Supreme Court of Illinois in *Johnson* that the decedent never "made any withdrawals or otherwise exercised any of her reserved powers to deplete the trust assets." 73 Ill.2d at 365, 22 Ill.Dec. 709, 383 N.E.2d at 195. With regard to this factor, a court should concern itself more with whether the decedent exercised power that was "unfettered." *See Knell,* 318 Md. at 512, 569 A.2d at 641. When a decedent exercises a power that is limited, for example the right to collect income from a trust, it should be viewed as less significant, although not irrelevant, then exercising the right to invade the principal or revoke the trust. *See generally Johnson,* 73 Ill.2d at 350, 22 Ill.Dec. 709, 383 N.E.2d at 188 (finding significance in the fact that decedent did not exercise power to withdraw from principal of trust or deplete the trust assets).

Gilles apparently did not take distributions from the TOD accounts; nor did he take distributions from at least two of the cash accounts that he transferred to the Trust. The record does not indicate that Gilles invaded the principal of the trust during his lifetime. These facts might suggest that Gilles did not intend to continue having "unfettered" use of his accounts. *See Knell,* 318 Md. at 512, 569 A.2d at 641. They might support a finding that Gilles intended to cordon off the money in all five accounts for Lauren's benefit, as of the time he created the Trust. Nonetheless, this factor should be

considered more thoroughly by the trial court on remand, and perhaps more evidence needs to be taken to determine whether, and to what extent, Gilles collected the income on the Trust and whether, and to what extent, Gilles invaded the Trust principal or took distributions from the accounts after he put them in the Trust.

A final factor that courts should pay particular attention to is the familial relationship between the decedent and the person or persons who benefit by the challenged *inter vivos* transfer. This is another consideration that, until this point, we have not itemized expressly, even though it has been an apparent influence in our prior decisions. An *inter vivos* transfer, whereby a decedent provides for children from a previous marriage in derogation of the estate due to a surviving spouse, may be reasonable, especially if the decedent and the surviving spouse were married only a short time. Courts must be cognizant of this and view such *inter vivos* transfers differently than they would view a similar transaction in a single family unit. *See Collins,* 98 Md. at 484, 57 A. at 601 (invalidating *inter vivos* conveyance, but noting that where a similar "conveyance embraces only a part of the husband's estate, or where provision is made out of the estate for children by a former marriage, the questions thus presented are left open for future consideration"). An estate planning arrangement that provides for children from a previous marriage or, for that matter, for children not born in wedlock, facially appears legitimate and, hence, may not bear the hallmarks of a mere device or contrivance. *See Winters,* 254 Md. at 585, 255 A.2d at 27 (recognizing decedent's desire to provide for grandchildren and great-grandchildren that descended from decedent's son from first marriage was "not only understandable but legitimate"); *Whittington,* 205 Md. at 14, 106 A.2d at 78 (upholding trust accounts that decedent established for his sons from a prior marriage "[i]n light of the family relationships of the parties involved"). Familial circumstances bear even more in favor of upholding an *inter vivos* transfer when the decedent was a widow or widower before marrying the surviving spouse; if that is the case, it

suggests that the decedent believed that her or his children from the earlier marriage rightfully deserve the property and, hence, that the *inter vivos* transfer to the children was not a mere device or contrivance. *See Bestry*, 180 Md. at 44, 22 A.2d at 554 (noting that leasehold interest conveyed to daughter from earlier marriage was paid for predominantly by the decedent's first husband before he died and that "the decedent on many occasions expressed a view that the property should go to [her daughter]").

In the present case, Gilles and Kathleen were married for four years. Lauren is his daughter from his first marriage. Moreover, pursuant to his separation agreement with Bernadette, Gilles had a pre-existing (as to his marriage to Kathleen) obligation to provide for Lauren in the event of his death. The circumstances may suggest that Gilles was not using the Trust in bad faith "to shield his assets." *See White*, 875 A.2d at 663. Instead, they may tend to suggest that Gilles intended that the money be preserved for Lauren because he had an obligation, legally and as her father, to see that she receives her due. *See Bestry*, 180 Md. at 47, 22 A.2d at 554 (upholding decedent's deed of property to her daughter where daughter's father (and decedent's first husband) paid for most of the property); *Whitehill*, 161 Md. at 661, 158 A. at 348 (upholding decedent's deed of all of her property to her children because they paid for the property in the first instance). Nonetheless, it is the province of the trial court to determine how to consider and weigh this factor in this case and how it should be weighed in combination with the other factors, and any other fact that the trial court deems relevant. In weighing this factor, we do not think it improper for the trial court to consider also whether, and to what extent, Kathleen cared for Gilles during his final illness.

These factors are by no means an exhaustive list. We recognize that they often may overlap. As stated earlier, we are not certain what the trial court meant when it found that Gilles did not intend to defraud Kathleen. If the trial court was looking solely for fraud, it applied the wrong standard;

however, we may not substitute our judgment on the facts for that of the trial court. Accordingly, we must remand this case for further proceedings not inconsistent with this opinion and, if necessary, the taking of additional evidence.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTION TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AND REMAND THE CASE TO THE CIRCUIT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO ABIDE THE RESULT.